**POLISH NAT. ALLIANCE OF UNITED STATES OF NORTH AMERICA v. NATIONAL LABOR RELATIONS BOARD.**

No. 8090.

Circuit Court of Appeals, Seventh Circuit.

June 5, 1943.

Casimir E. Midowicz and Ewart Harris, both of Chicago, Ill., for petitioner.

Lester Asher, N.L.R.B., of Chicago, Ill., and Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Jacob I. Karro, William J. Isaacson, and John H. Garver, Attys., N.L.R.B., all of Washington, D. C., for respondent.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon petition of the Polish National Alliance to review and set aside an order issued by the National Labor Relations Board, pursuant to Sec. 10(c) of the National Labor Relations Act, 29 U.S. C.A. § 151 et seq. The Board in its answer requested enforcement of its order.

The order is based upon findings that petitioner violated Sec. 8(1), (3) and (5) of the Act by its refusal to bargain collectively with Office Employes' Union No. 20732, A. F. of L. (hereinafter called the Union), by its discriminatory discharge of Anna Owsiak, by its discriminatory refusal to reinstate, upon application, a group of twenty-seven employees who had engaged in a strike caused and prolonged by petitioner's unfair labor practices, and by its anti-union conduct and statements. The Board, upon such findings, entered its order containing the usual cease and desist provisions and affirmative requirements.

The contested issues may be classified generally as (1) whether the Board has jurisdiction of petitioner or, more accurately perhaps, whether petitioner is subject to the Act, and (2) whether the Board's findings as to the unfair labor practices are supported by substantial evidence.

The jurisdictional provision of the Act is Sec. 10(a), which provides: "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice affecting commerce."

The critical words, fixing the limits of the Board's authority in dealing with labor practices, are "affecting commerce." The Act specifically defines the "commerce" to which it refers (Sec. 2 (6): "The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States * * *." The Act also defines the term "affecting commerce" (Sec. 2(7): "The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

In National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, on page 32, 57 S.Ct. 615, on page 622, 81 L.Ed. 893, 108 A.L.R. 1352, wherein the question of the Board's jurisdiction was considered at length, the court stated: "Whether or not particular action does affect commerce in such a close and intimate fashion as to be subject to federal control, and hence to lie within the authority conferred upon the Board, is left by the statute to be determined as individual cases arise. We are thus to inquire whether in the instant case the constitutional boundary has been passed."

It therefore appears pertinent, in considering the question before us, to make a rather detailed statement of petitioner's activities. Petitioner is a fraternal benefit society, organized under the laws of the State of Illinois as a not-for-profit corporation. It is carried on for the benefit of its members, most of whom are certificate holders and their beneficiaries. It has a lodge system with ritualistic form of work

and a representative form of government. Its purpose, as stated in its charter, is "to promote the cultural, social and economic advancement of its members, to foster fraternalism and patriotism among them, to provide death, disability, accident and other benefits to its members and their beneficiaries." Its membership, the creation, maintenance and disbursement of funds, and its activities generally, are performed in accordance with its by-laws and the laws of the State of its creation. Its supervising officials are elected at regular conventions, and constitute its supreme governing body. The convention is made up of delegates selected from local lodges. As its name indicates, only persons of Polish descent are eligible for membership. The preamble to its constitution recites the hardships and sacrifices which have been endured by the people of Poland as the reasons why many of them sought refuge in this country. The general purpose in founding the Polish National Alliance was to insure such Polish people of a more perfect union in this country and a proper moral, intellectual, economic and social development, and to secure by all legitimate means the restoration and preservation of the independence of the Polish territories in Europe.

Petitioner is organized into 1,817 lodges and is licensed to do business in twenty-six states, the District of Columbia, and Manitoba, Canada. Lodges are grouped into 190 councils, 160 of which are outside of the State of Illinois. On December 31, 1941, petitioner had in force 272,897 insurance benefit certificates with a total face value of $159,683,583. Such certificates afford every form of protection ordinarily furnished by life insurance companies and include: (1) Ordinary life, (2) 20-year payment life, (3) 20-year endowment, (4) endowment at age of 65, and (5) combined term and paid up at age of 65. Petitioner's manual states: "The premium rates on all certificates of insurance, and also the reserves, are computed on the basis of the American Experience Table of Mortality with interest at the rate of three per cent (3%) per annum, according to the Illinois standard basis. These assumptions are the most conservative used by American life insurance firms." Net earnings are distributed as dividends to members in accordance with the varying provisions of the certificates they hold; the certificates have a cash value which may be with-

drawn by the member or utilized as security for a loan. Premiums collected, in excess of benefits paid out, become a part of petitioner's investments. It owned on December 31, 1941, assets of $30,090,835, represented by a variety of properties and securities. Investments in railroads totaled $1,500,000, bond holdings in public utilities and large scale industry operating in all sections of the country amounted to almost $3,000,000, extensive real estate holdings in five states were valued at $11,000,000, and holdings in securities of the United States, of state governments, and of nationally distributed political subdivisions totaled more than $8,000,000. During 1941, its total income was $5,717,344, of which $3,723,364 was received from members and $1,690,250 from investments. During this same year, benefits paid totaled $1,845,126.

Petitioner's business is managed by officers and directors from its Chicago office. As presently constituted, a person who becomes a member must also become a certificate holder. All terms and conditions of the benefit certificates are determined, investments made, applications for certificates, claims, and loans acted upon, and all benefit certificates and checks issued at the home office in Chicago. Its securities are purchased through licensed dealers, and with the exception of $11,000 on deposit with authorities in Manitoba, Canada, are kept in Chicago.

Sub-standard risks are reinsured through Lincoln National Life Insurance Company, and reinsurance documents are sent to that company's home office in Fort Wayne, Indiana. More than $250,000 of such insurance was in effect at the time of the hearing. The Credit Company of Atlanta, Georgia, rendered inspection reports concerning the financial standing and character of applicants for benefit certificates. Petitioner employs organizers in twenty-six states to obtain new members, and advertises in newspapers, magazines and other media. In 1941, the sum of $169,000 was disbursed for commissions and fees of field agents, $20,000 for compensation of "managers" engaged in soliciting, over $17,000 for "field supervision and traveling expenses," $15,000 for traveling expenses of officials, $13,000 for medical examinations, $4,000 for credit investigations of applicants in their respective localities, and $19,000 for postage and express, telegraph and telephone service. Petitioner also holds direct control of Alliance Printers and Publishers, Inc., located in Chicago, which pub-

lishes the Zgoda, petitioner's official publication. Over 1,000,000 copies of the daily edition and over 5,000,000 copies of the Sunday edition of this publication are mailed to members outside the State of Illinois. Petitioner, since its organization, has spent large sums of money for charitable, educational and fraternal activities among its members, including the sum of $252,210.03 in the year 1941.

The Board found: "Although the respondent has been organized as a non-profit corporation and its charter emphasizes the cultural and social purposes of its incorporation, these factors are not conclusive of the question of our jurisdiction; the determining point is what the corporation does. The activities of the respondent in issuing insurance benefit certificates and its attendant investments mark it as an insurance company. * * * Moreover, the fact that the respondent may not be organized for 'profit' does not place it beyond our jurisdiction. We find that the respondent is engaged in commerce within the meaning of the Act."

Petitioner attacks this finding. It argues that it is a fraternal benefit society operating without profit to it, and that the insurance feature of its business is merely incidental to its main purpose. The Illinois statute under which it is organized and a number of decisions from courts of that State are cited in support of the distinction recognized between insurance companies and fraternal benefit societies. In discussing such distinction, the court in People v. Commercial Ins. Co., 247 Ill. 92, 101, 93 N.E. 90, 94, said: "Life insurance companies are organized to engage in the business of insuring the lives of persons for profit. * * * The primary object of fraternal associations is to obtain social intercourse among the members and to furnish relief and assistance to members and persons dependent upon them,—not upon a commercial or business basis, but upon the broad principle of friendship and brotherly love. The insurance feature is but an incident to the main purpose of organization."

 Notwithstanding that petitioner is incorporated as a fraternal association, we think the conclusion is inescapable that it is engaged in the insurance business in a manner similar, if not precisely the same, as mutual life insurance companies. The latter form of company has no capital stock and no stockholders. Policyholders own all of its assets and participate in any distribution of profits. A description of a mutual company and its operations is found in Duffy v. Mutual Benefit Life Insurance Co., 272 U.S. 613, 47 S.Ct. 205, 71 L.Ed. 439, which also closely reflects the insurance feature of petitioner's activities. In view of the facts heretofore stated, there can be little doubt but that a membership certificate in the Polish Alliance is the equivalent of a policy in an insurance company. The member is the insured, the certificate the policy, and the Alliance the insurer. We think we need not labor the distinction which petitioner seeks to draw between a fraternal society and an insurance company. After all, for the purpose of the instant case, it is rather immaterial what label we attach to petitioner's activities. Of more importance is the nature and character thereof. The fact that it was organized for noble and patriotic purposes and has continued in that groove, is not inconsistent with a finding that it has and is engaging in the business of insurance. Also, we are not impressed with the contention that the latter is merely incidental to the former. So far as we can ascertain from the record before us, we are of the view that it is more accurate to conclude that its fraternal activities are incidental to its insurance business. For instance, in 1941 it spent the sum of $252,210.03 for charitable and fraternal activities out of a total income of $5,717,344, or less than 5%. In this connection, it is pertinent to observe that in petitioner's manual of 1940, addressed to all its members, it is stated:

"From the simple and modest beginning of sixty years ago, the Polish National Alliance in recent times has greatly expanded and developed into a large fraternal insurance organization. While idealogically it has remained ever true to its principles and today pursues its ideals with vital eagerness, through its expansion it has entered the field of sharp competition of business institutions.

"* * * Accordingly, in the last few years a large variety of marketable certificates of insurances have been issued, ranging from the ordinary life type to that of the endowment kind, which in turn called for a manual, explaining this increase and change of insurance."

Petitioner also contends that it is not within the Act, even though it be held to be in the insurance business, for the reason that insurance is not commerce. A

long line of Supreme Court decisions have so held, or at any rate have held that the issuing of a policy of insurance is not a transaction in commerce. Paul v. Virginia, 75 U.S. 168, 8 Wall. 168, 19 L.Ed. 357; Hooper v. California, 155 U.S. 648, 15 S.Ct. 207, 39 L.Ed. 297; New York Life Insurance Co. v. Cravens, 178 U.S. 389, 20 S.Ct. 962, 44 L.Ed. 1116; New York Life Insurance Co. v. Deer Lodge County, 231 U.S. 495, 34 S.Ct. 167, 58 L.Ed. 332. The support which these cases afford petitioner's contention is not so real as first impression might indicate. Certainly they are not decisive. It must be noted that in each of them the court was considering the power of the state to tax or regulate, and not the power of Congress under the Commerce Clause. It has frequently been held that the line which marks the beginning of the state's power to tax or regulate is not the terminal boundary of federal power. "It does not follow that because a thing is subject to state taxation it is also immune from federal regulation under the Commerce Clause." Binderup v. Pathe Exchange, 263 U.S. 291, 311, 44 S.Ct. 96, 100, 68 L.Ed. 308. To the same effect, Swift & Co. v. United States, 196 U.S. 375, 400, 25 S.Ct. 276, 49 L.Ed. 518; Chicago Board of Trade v. Olsen, 262 U.S. 1, 33, 43 S.Ct. 470, 67 L.Ed. 839. The cases dealing with the power of the state were again distinguished in the recent case of Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. ——. 317 U.S. on page 121, 63 S.Ct. on page 87, 87 L.Ed. ——, the court said: "For nearly a century, however, decisions of this Court under the Commerce Clause dealt rarely with questions of what Congress might do in the exercise of its granted power under the Clause and almost entirely with the permissibility of state activity which it was claimed discriminated against or burdened interstate commerce. During this period there was perhaps little occasion for the affirmative exercise of the commerce power, and the influence of the Clause on American life and law was a negative one, resulting almost wholly from its operation as a restraint upon the powers of the states."

A comparison of petitioner's activities with those of the Associated Press in Associated Press v. N. L. R. B., 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, makes that decision of persuasive and perhaps controlling importance. There, the court considered the activities of a cooperative organization of 1,350 members, which did not operate for profit, although its members were representatives of newspapers which did operate for profit. Its means of communication in receiving and transmitting news consisted of telegraph and telephone wires, messenger service, the wireless, and the mail. The court (301 U.S. at page 128, 57 S.Ct. at page 654, 81 L.Ed. 953) said: "These operations involve the constant use of channels of interstate and foreign communication. They amount to commercial intercourse, and such intercourse is commerce within the meaning of the Constitution. Interstate communication of a business nature, whatever the means of such communication, is interstate commerce regulable by Congress under the Constitution. This conclusion is unaffected by the fact that the petitioner does not sell news and does not operate for profit, or that technically the title to the news remains in the petitioner during interstate transmission."

It is beyond question that a large portion of petitioner's activities were of a business nature and carried on by interstate communication. Applying the pronouncement in the Associated Press case, such business is interstate commerce within the power of Congress to regulate.

Even though petitioner's contention that it is not directly engaged in interstate commerce be tenable, it would still be faced with an insurmountable barrier. As already noted, the power of the Board is not limited to commerce but includes "affecting commerce," which Congress has defined as "burdening or obstructing commerce or the free flow of commerce." We think it cannot be reasonably contended that a labor dispute between petitioner and its employees, with strikes and stoppage of work, would not seriously interfere with petitioner's far flung activities and constitute a burden upon commerce, as well as an impairment of the free flow of commerce.

Any doubt heretofore existing as to the broad and well near conclusive power of Congress over transactions and activities "affecting commerce" has been dispelled by the Supreme Court in Wickard v. Filburn, supra. In that case, the court had before it an attack upon the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1281 et seq., which fixed marketing quotas for certain farm products, with a penalty for production in violation of such quotas. The particular facts before the court, briefly stated, were that a farmer sowed 23 acres of wheat, or some 12 acres in excess

of his quota. On this excess quota he produced 239 bushels, which were not sold on the market but utilized on his farm as feed for livestock. The penalty under the Act was imposed not only upon the excess production but upon all that he had produced. It was argued that this production was purely of a local nature, could not have affected commerce, and was therefore beyond the authority of Congress. The court notes (317 U.S. at page 118, 63 S.Ct. at page 86, 87 L.Ed. ——) that the Act under attack extended federal regulation "to production not intended in any part for commerce but wholly for consumption on the farm." The court, in sustaining the Congressional power, 317 U.S. on page 125, 63 S.Ct. on page 89, 87 L.Ed. —— said: "But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'"

Thus, while the Supreme Court in N.L.R.B. v. Jones & Laughlin Steel Corp., supra (301 U.S. at page 30, 57 S.Ct. at page 621, 81 L.Ed. 893, 108 A.L.R. 1352), stated "that distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system," it appears, from the Filburn case, that the boundary line marking such distinction has been advanced to the point where only a mirage lies beyond. Perhaps the cackle of the farmer's hen as she announces the completion of her daily chore, or the squeal of his pig in its struggle to become a porker, are yet beyond this boundary line, but of this we give no assurance.

This decision that Congress is empowered under the Commerce Clause to regulate a farmer in the production of wheat, even though such "activity be local and though it may not be regarded as commerce," leaves little room to doubt but that the activities of petitioner are within the ambit of Congressional power. The fact, if such it be, that insurance is not commerce or that petitioner is a non-profit organization no longer requires a contrary conclusion. We therefore affirm the Board's determination that petitioner was within the provisions of the National Labor Relations Act.

No good purpose could be served by a detailed discussion of the evidence upon which the Board found that petitioner had engaged in unfair labor practices within the meaning of Sec. 8(1), (3) and (5) of the Act. It is sufficient, so we think, to state that we have reviewed the evidence and, appraising it in its aspect most favorable to the Board, as we must, it is sufficient.

 Perhaps the most serious question arises from the Board's finding and conclusion that petitioner refused to bargain with the Union, in violation of Sec. 8 (5). Petitioner attacks this finding both as to the appropriateness of the unit, and that the Union represented a majority in such unit. The majority found by the Board was such that the exclusion from the unit of a small number of employees would probably have left the Union with less than a majority. It is the theory of petitioner generally that some six or eight employees were included in the unit and about the same number, doing similar work, excluded, and it is asserted that their inclusion or exclusion depended upon whether they were members of the Union—in other words, that Union employees were purposely included and non-Union employees purposely excluded. The record indicates that there may be merit to petitioner's assertion in this respect. On the other hand, the Board argues with plausibility that certain employees were excluded because of the relation they sustained to management, which was closer and more intimate than that sustained by other employees who were included. We must accept the Board's finding as to an appropriate unit, unless it is clearly arbitrary. Pittsburgh Plate Glass Co. v. N.L.R.B., 313 U.S. 146, 152, 61 S. Ct. 908, 85 L.Ed. 1251; International Association of Machinists v. N.L.R.B., 71 App.D.C. 175, 110 F.2d 29, 46, affirmed 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50. We are not convinced that the Board's action in the instant case was arbitrary.

 In this connection, it is pertinent to observe that petitioner's refusal to bargain with the Union was at all times predicated upon its position that it did not come within the Act. At no time did petitioner refuse to bargain because the Union did not represent a majority of an appropriate unit. The complaint charged that "on or about March 26, 1941, and at all times thereafter, the respondent did fail and refuse to bargain collectively with the Union, etc." Petitioner in its answer admitted this charge but stated "that it is not en-

gaged in interstate commerce and therefore not subject to the jurisdiction of this Honorable Board or the provisions of the National Labor Relations Act." Notwithstanding this situation, we assume the Board had the burden of proving that the Union had a majority of the appropriate unit. On the other hand, it seems an employer is in an unfortunate position in attempting to justify before the Board its refusal to bargain for a reason that apparently did not occur to it prior to the time of hearing.

The members of the Union went on strike October 7, 1941, as a result of petitioner's refusal to bargain with the Union and other unfair labor practices. The strike lasted until January 27, 1942, when application for reinstatement was made on behalf of the striking employees. We think that the Board's order requiring that such employees be made whole from the date of their application for reinstatement is proper. In this connection, however, we desire to discuss the situation with reference to one Henry Ziolkowski, an employee who joined the strike on October 7, 1941. He soon decided that the strike was ill advised and on October 10 made proper application to return to work. This he was told he could do, provided he would file an application "as a new applicant for work." This he refused to do, on the ground that he would then be considered as a new employee with perhaps a loss of certain seniority privileges. The Board found, and we think properly, that he was entitled to unconditional reinstatement to his former work. The Board also found that the conditional offer of reinstatement was to punish Ziolkowski for having joined the Union and the strike, and that it constituted a discrimination against him in regard to the hire and tenure of his employment. We think this finding must be accepted. However, the Board's order leaves Ziolkowski in the same position as the twenty-six other strikers who did not make application for reinstatement until January 27, 1942. The Board attempts to justify this position upon the ground that "he attempted to return to work while the strike was still in progress, thereby abandoning the concerted activity to which his fellow employees resorted in consequence of the respondent's unfair labor practices." The Board also stated that it would be inequitable to treat him in a different manner from the other strikers. Some theory is advanced, which we do not

quite comprehend, that petitioner's discriminatory refusal to reinstate Ziolkowski on October 10, 1941 had the "effect of returning him to the status of a striker." If such be the case, his status resulted from petitioner's unfair practice and was not a status voluntarily assumed by him. At any rate, he was ordered made whole only from January 27, 1942, in the same manner as the other strikers who on that date made application for reinstatement.

In our view, this order as to Ziolkowski is clearly erroneous. Certainly, he as an individual, the same as any other employee, had a right to strike or not to strike as he saw fit. After having joined the strikers, he had an equal right to continue on strike with the others or to return to work as he saw fit. He chose the latter course, and, as the Board found, his right to work was discriminatorily denied by petitioner. One member of the Board dissented from the order as to Ziolkowski, stating that he was entitled to be made whole from October 10, 1941, the date when his application to return to work was discriminatorily denied. The soundness of the dissent, in our judgment, is unquestionable, and we take the liberty of quoting therefrom the following statement: "The policy of the Act would, in my opinion, be best served by encouraging those who have gone out on strike because of their employer's unfair labor practices to return to work and to avail themselves of the administrative remedy which the Act affords them and we should do nothing to deter any individual striker from such action. The effect of the majority's decision would, it seems to me, be to prolong unfair labor practice strikes and to discourage employees from recourse to the adequate relief available to them under the Act."

The Board also found that Anna Owsiak was discriminatorily discharged on October 6, 1941. Petitioner seeks to justify this discharge on some other ground, and contends that the finding is not substantially supported. A reading of the testimony raises some doubt as to the propriety of the Board's finding, but we cannot hold it is without substantial support. It therefore must be accepted.

The Board's order is directed at petitioner, its officers, agents, successors and assigns. In conformity with our previous holdings, the words "successors and assigns" will be eliminated.

182

Paragraph (d) of the affirmative provisions of the order requires petitioner to post notices "that the respondent's employees are free to become or remain members of Office Employes' Union No. 20732, A. F. of L., and that the respondent will not discriminate against any of its employees because of their membership in or activities on behalf of that organization." This provision will be amended so as to inform the employees that they are free to become or remain members of the designated Union "or any other organization of their own choosing," and that petitioner will not discriminate against them because of their membership in or activities on behalf of that organization "or any other organization of their own choosing."

The Board's request for enforcement of its order will be allowed upon amendment to conform with the views herein expressed.