## NATIONAL LABOR RELATIONS BOARD v. POTLATCH FORESTS, Inc.

### No. 12532.

United States Court of Appeals Ninth Circuit.

May 11, 1951.

Rehearing Denied July 6, 1951.

Robert N. Denham, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Fannie M. Boyls, Albert M. Dreyer, Maurice Alexandre, Attorneys, N.L.R.B., Washington D. C., for petitioner.

R. N. Elder, Robt. H. Elder, Sidney E. Smith, Coeur d'Alene, Idaho, George W. Beardmore, Lewiston, Idaho, for respondent.

Before ORR and POPE, Circuit Judges, and FEE, District Judge.

ORR, Circuit Judge.

National Labor Relations Board seeks enforcement of its order requiring respondent Potlatch Forests to cease and desist from maintaining the "strike seniority" policy, hereinafter described, on the ground that said policy discriminates against union members in violation of Sec. 8(a)(3) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(a)(3).

In 1944 the International Woodworkers of America was certified, and has since been recognized, as the exclusive bargaining agent for Potlatch's production and maintenance employees in its various establishments in Idaho. On April 1, 1946 Potlatch and the Union (the I.W.A. and its four locals) executed a Master Working Agreement, to expire at the end of one year, providing inter alia for seniority rights to govern in case of a reduction in force. Negotiations to renew this agreement in the spring of 1947 were disrupted over the question of wage differentials. An agreement extending all other provisions of the 1946 agreement until April 1, 1948, was executed, leaving the disputed question for further negotiations.

The parties being unable to agree, the Union called a strike in August 1947, thereby causing a shutdown of all the operations of Potlatch. Near the end of August 1947 Potlatch managed to resume operations, gradually accumulating both new employees and former employees who crossed the picket lines. The strike was later terminated and this group (hereinafter termed the "replacements") numbered about 1750 out of a normal complement in the bargaining unit of about 2600.

On October 10, 1947, the strike being hopelessly lost, the Union initiated negotiations to settle it. In the course of settlement negotiations, Potlatch vigorously asserted its desire to protect the job security of the replacements, as against possible displacement by those who would return on termination of the strike. The Union, on the other hand, desired that the seniority rights of this latter group (hereinafter called the "strikers") be fully protected. An agreement was reached and the strike terminated on October 13, 1947.

Immediately thereafter (apparently on October 14), Potlatch drafted in writing the "strike seniority" policy which gave rise to these proceedings. Under this policy, the strikers (those who returned to work on

or after October 13) were to be laid off ahead of the replacements (those new or former employees who were working on or before October 12), in case a reduction in force should become necessary by reason of a curtailment of Potlatch's activities. While this draft was not publicized at that time, the Board has stipulated that Potlatch has maintained the "strike seniority" policy without deviation since October 13, 1947.

In the spring of 1948 Potlatch and the Union undertook negotiations to renew their agreement and consolidate all prior agreements into one master agreement. They apparently reached an agreement, and initialed a memorandum to that effect. However, when the proposed master agreement was prepared by Potlatch and submitted to the Union for signature, the Union representatives refused to sign on the ground that a provision purporting to incorporate the "strike seniority" policy had not been agreed upon, or discussed, in the negotiations. Hence, the 1948 master agreement never became effective, but the parties continued to operate under previous understandings.

Meanwhile, Potlatch continued to maintain the "strike seniority" policy. We have no knowledge as to the exact time this policy was in fact applied to an individual case. The Board bases its petition not only on the maintenance of this general policy but also to its application in the case of two individuals, Cloninger and Walters, on December 30, 1948 and January 18, 1949. Both of these men were strikers who had remained out until the strike was terminated, and both were "bumped" by workers with inferior seniority rights, as measured on the pre-strike basis. Cloninger filed a grievance, which was carried by the Union to the highest authority provided for in the grievance procedure, short of conciliation. At that point, the grievance was settled and the Union agreed that Cloninger be put back to work under the "strike seniority" policy, but expressly noted that the Union was not agreeing to the general validity of that policy. Walters filed no grievance.

On February 16, 1949, a charge was filed by the International Woodworkers of America, Local 10–364, signed by the vice-president of the International. This charge, as later amended, alleged that Potlatch violated Sec. 8(a)(1) and (3) of the Act, in maintaining and giving effect to the "strike seniority" policy. At the hearing before the Trial Examiner, the general counsel conceded that Sec. 8(a)(1) was involved only to the extent that the alleged violation of Sec. 8(a)(3) would itself constitute a violation of the broader Sec. 8(a)(1), there being no issue of an independent interference with the rights of employees guaranteed by Sec. 7. The Board held that Potlatch's conduct violated Sec. 8(a)(3), which provides that it "shall be an unfair labor practice for an employer * * * by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *." The Board ordered Potlatch to cease and desist from maintaining or giving effect to the "strike seniority" policy and to post the customary notices. 87 N.L.R.B. 1193. The Board made no order relative to reinstatement of Cloninger and Walters, as they had already returned to work. No back pay was ordered for the reason that no claim was made in one case and was not justified in the other.

The Act does not confer upon Cloninger and Walters, nor upon the other strikers, specific seniority rights of which it is alleged they are being deprived; the Act merely prohibits discrimination in establishing and applying seniority policies. Seniority rights generally derive their scope and significance from union contracts. Aeronautical Industrial Lodge v. Campbell, 1949, 337 U.S. 521, 526, 69 S.Ct. 1287, 93 L.Ed. 1513. The Board found that Potlatch in 1947 agreed to, and has at all times since been bound by, contractual provisions conferring upon the strikers seniority rights of which they are being deprived by the application of the strike seniority policy. This finding was made despite Potlatch's contentions that the Union in 1947 agreed to, and has at all times since been bound by, the strike seniority policy.

Contrary to the significance given the various agreements by the Board, we deem it unnecessary to consider the validity of the Board's finding because a charge that

the maintenance by Potlatch of the "strike seniority" policy constitutes a breach of a collective bargaining agreement should properly have been brought under Sec. 8 (a)(1) or (5). That the charge in this case is confined to Sec. 8(a)(3) was conceded by counsel for the Board at the hearing before the Trial Examiner. (Record p. 88) Sec. 8(a)(3) prohibits *discrimination,* not breach of contract. So far as Sec. 8(a)(3) is concerned, Potlatch may adopt any rule of seniority it desires— whether or not that rule violates an existing agreement—so long as that rule does not discourage union membership by discrimination. Cf., Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir., 1940, 111 F.2d 340, 351–353. Hence, the sole question for determination is whether the acts charged constitute discrimination under Sec. 8(a)(3).

In considering this question, it must be recognized at the outset that this case concerns what is generally termed an "economic strike," rather than an "unfair labor practice strike." If this strike had resulted from an unfair labor practice of Potlatch, proceedings to remedy that unfair labor practice, if not barred by the limitations of Sec. 10(b), could properly culminate in an order of reinstatement with full seniority rights, if the Board concluded that that remedy was appropriate to wipe out the effects of the prior unfair labor practice. Cf., Republic Steel Corp. v. National Labor Relations Board, 3 Cir. 1940, 114 F.2d 820.

In this case the Board, being concerned with a simple "economic strike," in order to sustain an unfair labor practice must hold that the maintenance of the "strike seniority" policy, in and of itself constitutes an unfair labor practice. The Board cites Republic Steel Corp. v. National Labor Relations Board, supra; Polish National Alliance v. National Labor Relations Board, 7 Cir. 1943, 136 F.2d 175; National Labor Relations Board v. Star Pub. Co., 9 Cir., 1938, 97 F.2d 465. We do not consider those cases controlling because of the nature of the strike.

Also, cases dealing with a discriminatory selection, among the returning strikers, of those individuals to be reinstated to fill the vacancies remaining when the strike is terminated, such as, National Labor Relations Board v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 346, 58 S.Ct. 904, 82 L.Ed. 1381; National Labor Relations Board v. Sandy Hill Iron & Brass Works, 2 Cir. 1947, 165 F.2d 660; cf., National Labor Relations Board v. Walt Disney Productions, 9 Cir., 1944, 146 F.2d 44, have no application. Potlatch has exhibited no anti-union prejudices, and in making the selection has provided that all of the individuals in the returning group retain full seniority rights as between themselves.

There has been no discrimination between union and non-union employees on the basis of union membership, as in the case of National Labor Relations Board v. Waterman S.S. Corp., 1940, 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704. The group of replacements includes union members, some of whom had been out on strike but had returned to their jobs before the strike was settled. The sole "discrimination" charged is between the replacements and those strikers who returned to work after the strike was settled. As between these two groups, no "discrimination" is charged with regard to rates of pay, promotions, etc. The sole "discrimination" charged is said to be found in the "strike seniority" policy, by which the strikers returning after the settlement of the strike are laid off before the replacements, in the event of an economic curtailment.

Failure of an employer to maintain previous seniority rights for returning strikers may be said to discourage union membership, but many acts of an employer which seem to come within the language of Sec. 8(a)(3) are nevertheless permissible if they are done for a legitimate business purpose. "The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority

a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion. The *true purpose* is the subject of investigation with full opportunity to show the facts." National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 45–46, 57 S.Ct. 615, 628, 81 L.Ed. 893. (Emphasis supplied.)

Unlike the usual case, the unfair labor practice charged here is the adoption of a general policy applicable to all employees, rather than isolated acts of discrimination. Presumably, the Board impliedly found that the true purpose motivating Potlatch's adoption of the "strike seniority" policy was a desire to penalize those members of the Union who had most persistently asserted the Union's demands. The only evidence to support such a finding is the conclusion that Potlatch must have realized the inevitable consequences of the policy. Such a conclusion is not enough to support the finding of a discriminatory motive where the conduct complained of is consistent with the legitimate exercise of the employer's "right to protect and continue his business by supplying places left vacant by strikers." National Labor Relations Board v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345, 58 S.Ct. 904, 911, 82 L.Ed. 1381. While the employer may know that hiring replacements tends to dissipate the effects of the strike, and thereby tends to discourage union activities, such conduct is regarded as a legitimate weapon of economic warfare. Reasonable "discrimination" in the exercise of this right is justified by the employer's legitimate interest. He "is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by (the employer) to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice, nor was it such to reinstate only so many of the strikers as there were vacant places to be filled." National Labor Relations Board v. Mackay Radio & Telegraph Co., supra, 304 U.S. at page 345–346, 58 S.Ct. at page 911.

In the instant case, therefore, the "discrimination" between replacements and strikers is not an unfair labor practice despite a tendency to discourage union activities, because the benefit conferred upon the replacements is a benefit reasonably appropriate for the employer to confer in attempting "to protect and continue his business by supplying places left vacant by strikers." Hence, we think the specific question posed here has been answered by the Supreme Court by recognizing that an employer attempting to fill a number of positions must be able to offer a substantial degree of security (as well as attractive wages), and that an employer may properly assure the replacements that "their places might be permanent." If there are not enough jobs to go around at the time the strike is settled the rights of replacements prevail over strikers.

While the Mackay Radio case can be formally distinguished on the ground that the Supreme Court in that case was considering a shortage of jobs at the time the strike was settled, rather than a shortage caused by a later curtailment of activities, the assurance of permanent employment in the latter event is equally justifiable.

The record here does not disclose that Potlatch in fact assured the replacements that "their places might be permanent"; however, that assurance need not be proved. The Supreme Court in the Mackay Radio case was concerned not so much with an explicit promise of permanent tenure as with the propriety of the employer's concern for that tenure. In this case Potlatch advocated "strike seniority" before the strike was settled, adopted that policy at the time of settlement and has consistently maintained that policy at all times thereafter. Potlatch has, since prior to the settlement of the strike, endeavored to make the places of the replacements as nearly permanent as may be. The propriety of this concern was settled in the Mackay Radio case.

Having concluded that the Board erred in holding that Potlatch committed an unfair labor practice makes it unnecessary to consider other questions presented.

Petition denied.