## TEXAS CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 12916.

United States Court of Appeals
Ninth Circuit.

July 29, 1952.

J. A. McNair, Los Angeles, Cal., Charles M. Brooks, New York City, for petitioner.

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. Gen. Counsel, Dominick L. Manoli, Morris A. Solomon, Washington, D. C., Attys., National Labor Relations Board, Charles K. Hackler, Chief Law Officer, National Labor Relations Board, Los Angeles, Cal., for respondent.

Before HEALY, BONE, and POPE, Circuit Judges.

HEALY, Circuit Judge.

The Texas Company, pursuant to § 10(f) of the National Labor Relations Act as amended, 29 U.S.C.A. § 160(f), petitions the court to review and set aside an order of the National Labor Relations Board re-

quiring it to offer employment to one George Cody, a former supervisory employee discharged for cause, and to make him whole for loss of pay suffered from the date of petitioner's refusal to take him back as an ordinary employee. The Board found that the refusal to hire Cody violated § 8(a) (3) of the Act, 26 U.S.C.A. § 158 (a) (3); and in its answer here it asks enforcement of its order.

The situation, as well as the question at issue, is novel and a somewhat extended statement of the facts seems requisite. The petitioner is engaged in the production of crude oil in the Los Angeles area and elsewhere in California. It operates a refinery at Los Angeles and a pipeline division which is administered by its refinery department. At various times since 1938 the Oil Workers International Union and its Local 128 have represented groups of the petitioner's employees. At all times prior to September 1948 the relations between petitioner and the Union had been amicable. On September 4, 1948 the Union called a strike against petitioner and other oil companies. Certain unfair practice charges arising out of the strike were filed against petitioner, but the Board found that except with respect to Cody no unfair labor practices had been committed and that there had at no time in the past been any anti-union animus on petitioner's part in its dealings with the Union. The strike was found to have been an economic strike from its inception until its termination in November of 1948.

Cody had served in the employ of petitioner's pipeline department from April 1928 to February 1948 in various rank-and-file jobs from laborer to field gauger. He joined the Oil Workers Union as early as 1934, and during his subsequent employment was very active in that Union. In 1941 he took successive leaves of absence for a period of 18 months to serve as an international representative of the Oil Workers. For an unspecified period ending with his promotion to supervisory work in February 1948 he served the Local as chairman of its Texas Company unit, participating in contract negotiations with the Company and handling grievances arising

under the contract covering the refinery and pipeline employees. In the month last mentioned he was promoted to the position of assistant foreman, at which time he secured a withdrawal card from the Union at the request of Superintendent Dreyer.

Cody was away on vacation at the time the Oil Workers' strike commenced. Upon his return he telephoned assistant superintendent Jones and was told of the strike. Jones advised him to come back to work, as the petitioner had obtained a picket line pass for him from the Oil Workers to do maintenance, safety and patrol work. Beginning with September 12 he patrolled petitioner's pipe lines, checked its pumps stations, and reported on various conditions prevailing at the property. This was work normally done by nonsupervisory employees included in the bargaining unit, some of whom were normally under Cody's supervision. On September 21 Cody declined to deliver strappings, a type of table used in measuring the capacity of oil tanks; and on the next day declined to deliver run tickets—reports showing the movement of oil in the pipe lines—deeming this to be direct participation in operations.

In the latter part of September the petitioner decided to resume certain operations and accelerate others, a decision which the Board found was "motivated by bona fide business considerations." On September 28, on reporting to Jones' office Cody was informed of the Company's operational plans and advised that the men were to ride in pairs on lengthened, overtime schedules. He was told to gauge and sample tanks at the Yorba Linda pumping station some time before October 1. Cody objected to doing this work on the ground that it was work normally done by nonsupervisory employees who were out on strike. He reminded Jones of his long service on behalf of the Union, saying that because of his past association with the Union he had "an actual fear of what would happen to his family and his home" if he undertook to perform the work. During this conversation Superintendent Dreyer entered Jones' office, and when informed by Dreyer that he must perform the assignment, Cody asked Dreyer "if he couldn't haul his part-

ner and let him do the work." Dreyer replied that this would not be fair, and that if Cody couldn't do the work they would have to discharge him. Upon Cody's refusal to obey the order to gauge and sample the tanks and get the station ready to run, he was discharged. Dreyer testified that at that conference he told Cody that the latter "would have to decide whether he was going to be on our team or not," and that Cody replied, "Can't I be on a team of my own?" Whereupon Dreyer said, "No, there are only two teams in this game." Nowhere in the record does it appear that Cody controverted this testimony.[1]

At various times after his discharge Cody applied for reinstatement. Up until November 16, 1948, he asked to be restored to his former supervisory post, but at that time and later he asked for "any job." The Trial Examiner found (and the Board accepted the finding) that he was denied rank-and-file employment because of the misconduct that had occasioned his discharge, namely his refusal as a supervisor to perform services assigned him. The Examiner further found that Cody's membership in and aggressive support of the Oil Workers, or the prospect of his resuming these activities in a rank-and-file job, played no part in petitioner's refusal to permit Cody's return as an employee. With this finding, also, the Board appears not to have disagreed.

In his report the Examiner concluded that petitioner did not discriminate with regard to Cody's hire and tenure in order to discourage membership in a labor organization, hence its refusal to employ him was not a violation of § 8(a) (3) of the Act.[2] The

Board, two members dissenting, disagreed with the latter conclusion. It felt that the Examiner had "misconceived" the effect of the 1947 amendments removing supervisors from the protection accorded employees. It said that the "cause" leading to Cody's discharge "was concerted activity which, had Cody been an 'employee,' would have rendered the refusal to employ him unlawful." It stated, in effect, that Cody's conduct as a supervisor must have been "tainted with illegality" in order to justify petitioner's subsequent refusal to hire him; and it stressed "the special character of the limitations on union activities by supervisors." It ruled that the refusal to hire Cody "necessarily" discouraged membership in the labor organization involved, and that it constituted a violation of § 8(a) (3).

We are of opinion that it was the Board rather than the Examiner that misconceived the effect of the 1947 amendments. Its holding appears to us to run counter to the purpose Congress had in mind removing foremen and other supervisory personnel from the protection of the Act and placing them in the category of management.[3] As the Board's brief here concedes, it is clear from the history of the Taft-Hartley legislation that Congress intended to restore to employers the right and power to insist upon the undivided loyalty of their supervisory personnel.[4] The following observations of Senator Taft are especially illuminating:

"The bill provides that foremen shall not be considered employees under the National Labor Relations Act. They may form unions if they please, or join unions, but they do not have the protection of the National Labor Relations

---

1. Superintendent · Dreyer stated further that at that time he told Cody that the management had been advised "that there are no pickets at the station [referring to the Yorba Linda station]. There may be some from time to time. If there are, select any time between now and the 1st of October to do the work. Don't get into any argument with the pickets if there are 'any there, but back off. We don't want it that bad." The record does not disclose that Cody controverted this testimony.

2. "Sec. 8(a) It shall be an unfair labor practice for an employer— * * *
   "(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *."

3. Sec. 2(3) (11) of the Act, as amended.

4. See House of Representatives Report No. 245, on H.R. 3020, 80th Congress, 1st Session, pp. 13–14. See also Senate Report No. 105, on S. 1126, 80th Congress, 1st Session, pp. 3–4.

Act. They are subject to discharge for union activity, and they are generally restored to the basis which they enjoyed before the passage of the Wagner Act.

"It is felt very strongly by management that foremen are part of management; that it is impossible to manage a plant unless the foremen are wholly loyal to the management. We tried various in-between steps, but the general conclusion was that they must either be a part of management or a part of the employees. It was proposed that there be separate foremen's unions not affiliated with the men's unions, but it was found that that was almost impossible; that there was always an affiliation of some sort; that foremen, in order to be successful in a strike, must have the support of the employees' union. A plant can promote other men to be foremen if necessary. The tie-up with the employees is inevitable. The committee felt that foremen either had to be a part of management and not have any rights under the Wagner Act, or be treated entirely as employees, and it was felt that the latter course would result in the complete disruption of discipline and productivity in the factories of the United States." [5]

■ Assuming, as the Board held, that Cody's conduct as a supervisor was "concerted activity," it is immaterial that had he been an employee he would have been immune from reprisal on that score. The fact is indisputable, but it proves nothing. Even an employee may not be ordered reinstated where he has been discharged for conduct which the Act does not protect.[6] Cf. N. L. R. B. v. Jamestown Veneer Corp., 2 Cir., 194 F.2d 192. But apart from the immateriality of the assumed situation, we are not able to agree that Cody's refusal to obey orders amounted to concerted activity for mutual aid or protection within the meaning of § 7 of the Act.[7] Compare N. L. R. B. v. Illinois Bell Tel. Co., 7 Cir., 189 F.2d 124, certiorari denied 342 U.S. 885, 72 S.Ct. 173; N. L. R. B. v. Rockaway News Supply Co., 2 Cir., 1952, 197 F.2d 111; N. L. R. B. v. Jamestown Veneer Corp., supra; N. L. R. B. v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284. Cody was not an "employee" and was not guaranteed any of the rights described in § 7. He did not confer with or join the strikers but sought to retain his supervisory post while insisting that he be permitted to select for himself what tasks he would perform. He alone, not the strikers or the Company, set the standards by which he chose to be governed in his work behind the picket line. He desired to be on "a team of his own." It is clear from his testimony that his action was individual, not concerted.[8] One may sympathize with the sentiments he entertained, but he was an intelligent man, under

---

5. Congressional Record, April 23, 1947, 93 Cong.Rec. 3952.

Senator Smith of New Jersey, a member of the committee which considered this litigation, remarked during the debates thereon that "It [the definition of supervisor as contained in § 2(11)] recognizes a supervisor as representing management, and not representing labor, and where the supervisor has to represent management, it seems only proper that he should not be in the category of being union-minded because unfortunately controversies between management and the unions do occur." 93 Cong.Rec. 4411.

Senator Flanders, author of a part of § 2(11), remarked "The reasons [for removing the supervisory force from the area of collective bargaining] are simple and direct. Unless the employer can hire and discharge, promote, demote, and transfer these men, he has lost the control of his business. He cannot run it effectively." 93 Cong.Rec. 4804.

6. In the 1947 legislation the authority of the Board to frame remedies was restricted by insertion of the following provision in § 10(c): "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause."

7. "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, * * *"

8. See Panaderia Sucesion Alonso, 87 N. L.R.B. 877, 880.

no misapprehension concerning his status, and he deliberately set his course with knowledge of the consequences.

We turn to the Board's holding that by declining to reemploy Cody for nonsupervisory work the petitioner violated § 8(a) (3) of the Act. Its basic finding in support of this ruling is that petitioner's refusal "necessarily discouraged membership" in the labor organization involved.[9] As already indicated, the Board agreed that § 2 (3) of the Act privileged Cody's discharge, and that the petitioner refused to employ him for the conduct which occasioned the discharge. It did not hold that petitioner's refusal was motivated by a purpose to interfere with or discourage union activity by rank-and-file employees.[10] It would seem clearly to follow, as the minority of the Board pointed out, that if any discouragement of union membership were occasioned, it would be incidental and permissible under the Act. N. L. R. B. v. Potlatch Forests, 9 Cir., 189 F.2d 82, 85, 86; Panaderia Sucesion Alonso, Note 8, supra.

Beyond that, however, we are not able to believe that petitioner's action would have a tendency to discourage union membership or activity. Cf. N. L. R. B. v. International Brotherhood of Teamsters, 8 Cir., 196 F.2d 1. Since the conduct for which Cody was denied reemployment was such as authorized his discharge as a supervisor, the conduct which would rationally be discouraged by the refusal to rehire him would be union activity by a foreman. Discouraging such activity is certainly permissible and not violative of the Act. Tri-Pak Machinery Service, Inc., 94 N.L.R.B. 1715.

In view of what has been said it is unnecessary to consider whether Cody, at the time he sought employment in a nonsupervisory position, was an "employee" within the holding of the Court in Phelps-Dodge

9. There was no finding, nor any substantial evidence to support a finding, that the refusal did in fact discourage such membership.

10. The Board relies on John Hancock Mut. Life Ins. Co. v. N. L. R. B., D.C.Cir., 191

Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271.

The order of the Board is set aside.

F.2d 483. In that case the Board found that the refusal to rehire a supervisor previously discharged for "incompetency" was because the individual gave testimony before the Board in a certification proceeding. Discrimination for such a reason is proscribed by § 8(a) (4) of the Act.