**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CALIFORNIA DATE GROWERS ASSOCIATION, Respondent.**

No. 15727.

United States Court of Appeals
Ninth Circuit.

Sept. 29, 1958.

Jerome D. Fenton, General Counsel, Thomas J. McDermott, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Owsley Vose, Ruth V. Reel, Attorneys, N.L.R.B., Washington, D. C., for petitioner.

Best, Best & Krieger, John D. Babbage, Riverside, Cal., for respondent.

Before STEPHENS, Chief Judge, and BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

This case arises under a petition pursuant to Sec. 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., herein the Act, by the National Labor Relations Board for enforcement of an order issued against Respondent, the operator of a date processing, packaging and shipping plant at Indio, California. No jurisdictional question arises.

The Board concluded that Respondent was guilty of unfair labor practices in that: (1) Respondent reduced or abolished the seniority of unreplaced economic strikers after a strike, as a penalty for striking, thus violating Sec. 8(a) (3) and (1) of the Act; (2) Respondent refused to bargain with the duly certified representative of its employees [1] thereby violating Section 8(a) (5) and (1) of the Act.

Respondent challenges both of these conclusions.

Respondent's packing operations are highly seasonal in nature and require a fluctuating labor force. In 1952, Respondent entered into a collective bargaining agreement with the Union wherein it was agreed that the determining factor for layoffs and rehirings would be departmental seniority. A "seniority list" was compiled pursuant to this agreement in November, 1952. By the terms of this agreement, the list was subject to modifications regarding employees who quit or were discharged for cause and those employees who were not on the November, 1952 list, but established "seniority" according to the terms of the collective bargaining agreement during the 1952–53 season. This "seniority list," with modifications, was used until December of 1953 at which time the Union called a strike against Respondent over certain new contract negotiations.

During the strike, Respondent, with the use of non-striking employees and some "replacements," continued to operate. Shortly after it was called (about 8 days) the Union terminated the strike and informed Respondent that the workers would report for work immediately. Respondent was unable to offer work to all the strikers because of sharp curtailment of operations due to a poor market, but as work became available, Respondent offered employment to the strikers in the order of their position on the aforementioned "seniority list" of 1952–53. Some strikers on this "seniority list" were not given employment at all, but at

---

[1] United Packinghouse Workers of America, AFL-CIO, Local Union No. 78, formerly the United Fresh Fruit and Vegetable Workers Local Industrial Union No. 78, CIO (hereinafter the Union).

the same time no work was given to strikers who had not been on the list.

On or about March 18, 1954, a so-called "hiring list" was posted by Respondent in its plant which contained substantial variations from the previous "seniority list" of 1952–53. This new "hiring list" was used for hirings and layoffs during the 1954–55 season in the same manner as had the 1952–53 "seniority list" been used in prior seasons.

■ Section 8(a) (3) of the Act prohibits an employer from discouraging membership in a labor union by means of discrimination in regard to hiring and tenure of employment. The courts have held that this prohibition includes all matters involving seniority and continuity of employment with regard to the reinstatement of striking employees upon termination of a strike. See Olin Mathieson Chemical Corp. v. N.L.R.B., 4 Cir., 232 F.2d 158, judgment affirmed 352 U.S. 1020, 77 S.Ct. 587.

There can be no doubt that the new "hiring list" promulgated by Respondent in March, 1954 and used subsequent to that time, did in fact discriminate against the strikers. *Some* of the strikers who had established seniority before the strike were not on this new list, and *all* the strikers were reduced in seniority on the new list to the extent that their seniority commenced from the time of their reemployment after the strike, thus reducing them to a "seniority" point below that of any worker employed during the strike.

Respondent contends, however, that it was not a violation of the Act for it to replace the strikers with new employees in order to continue its business during the strike, N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; further, that it was proper to give those employees hired during the strike an assurance that their employment would not be terminated by the return of the strikers and hence, a layoff and hiring policy designed to implement these assurances was proper and not un-

fair labor practice. N.L.R.B. v. Potlatch Forests, 9 Cir., 189 F.2d 82.

■ Mackay Radio & Telegraph Co., supra, and Potlatch, supra, indicate that without doubt the actions taken by Respondent in the instant case do not constitute unfair labor practices in and of themselves. Such actions in particular situations may be perfectly permissible within the Act. The *motive* of the employer in carrying out these actions becomes the controlling factor. Olin Mathieson Chemical Corp. v. N.L.R.B., supra; N.L.R.B. v. Potlatch Forests, supra; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45–46, 57 S.Ct. 615, 81 L.Ed. 893.

In the instant case the Board's finding that Respondent was *motivated* in its act of making a new "hiring list" by a desire to *punish* the strikers is supported by substantial evidence.

The record clearly indicates that prior to the posting of the "hiring list" (which was dated March 18, 1954) the employees of Respondent were not informed of a change of seniority. The record further indicates that even certain members of the management who were concerned with the personnel of the plant, were not informed of the existence of a new hiring and layoff policy until long after the termination of the strike. There is also testimony by one Wright, general manager of Respondent, to the effect that the new policy was concealed from strikers asked to return. At no place in the record is it indicated that Respondent found it *necessary* to promise the nonstriking employees seniority superior to that of the strikers in order to continue its operations.

These facts make the present case clearly distinguishable from the Potlatch case, supra, in that in Potlatch the employer made its position as to "super seniority" and protection of employment tenure for non-strikers, clear and open *before* termination of the strike.

The Board points out that a below noted agreement for a "consent election"

**590**

to which Respondent was a party, "does not establish Respondent's good faith when, as it had good reason to believe after the unsuccessful strike, the result might well have been adverse to the Union." Since the election was brought about by the filing by Respondent of a representation petition it would appear that the election would be a factor indicating antagonism toward the Union rather than the reverse.

■ We conclude there is substantial evidence in the record as a whole to support the Board's finding that Respondent revised its seniority list, (by means of its 1954 "hiring list") not to implement its assurances to the non-strikers but rather for the purpose of punishing employees who struck against it, and to discourage by this means further activity by those strikers or other employees in behalf of the Union, all in violation of Sec. 8(a) (3) and (1) of the Act.

After termination of the strike, Respondent filed with the Board a representation petition and thereafter entered into the above noted "consent election" agreement with the Union. The resulting election was closely contested and certain challenged ballots were sufficient in number to materially affect the result. After ruling on the contested ballots and counting those which he ruled valid, the Regional Director certified the Union. Since that time Respondent has repeatedly refused to bargain with the Union on the ground that the ruling of the Regional Director that certain ballots were valid, was arbitrary and capricious. 12 challenged ballots are in issue.

■ Among others, those persons on the 1953 pre-strike "seniority list" were eligible to vote except "those employees who have *quit* or been discharged for cause." (Emphasis supplied.) This provision as to eligibility to vote appears in the here noted "consent election agreement." The ballots in issue were those of twelve strikers on the 1953 pre-strike "seniority list." These 12 had been offered night work by Respondent after the strike and prior to the election, but for various personal reasons each had declined the offer for night work though some of them inquired concerning day work at that time. They were never offered any other work after the strike.

It is the contention of Respondent that by the act of declining this night work the 12 had "quit" their employment and thus were ineligible to vote within the provision of the consent agreement set out above.

The Board, in finding that refusal to work on the night shift was not "quitting" employment of Respondent, relies upon the testimony of several of the workers. These workers, some of them former foreladies and supervisors, testified to the effect that it was customary in Respondent's plant when a night shift was added, to offer such positions to those working on the day shift before offering work to other applicants; that refusal by those day shift workers of night shift work was not regarded as "quitting," and that their employment had not been terminated by such a refusal in the past.

Upon this testimony, the Board found it to be reasonable that the Regional Director should not regard the refusal of night shift work by the 12 former strikers as "quitting" since such a refusal had never before been so regarded. The record amply supports this conclusion.

■ Respondent further contends that the challenged ballots were counted in an arbitrary and capricious manner in that no representative of Respondent was present at the time of the count. It appears from the record that the time for counting the challenged ballots had been formally set for 2 o'clock in the afternoon of October 19, 1954, in the office of the Regional Director. All parties were notified. Prior to 2 p. m. no representative of Respondent made his presence known in the Regional Director's office

though in fact such a representative was present. At 2 p. m. the Union representative agreed to a delay of 15 minutes and at the end of that time the agent of the Regional Director in charge of the count inquired at the reception desk to determine whether a representative of Respondent had arrived. Since the Respondent's representative had not made himself known to the receptionist, the agent was given a negative answer. The agent then opened and counted the ballots in question in the presence of the Union representative.

The Board concluded that its agents had not acted arbitrarily and/or capriciously. We agree.

We conclude that the findings and conclusions of the Board are amply supported by the record and should be properly enforced by an appropriate order.[2] However, insofar as the order of the Board requires respondent to cease and desist from *"in any other manner"* interfering with, restraining or coercing its employees with relation to those matters protected by Sec. 7 of the Act and posting notices to that effect, we believe that the order is too broad. Respondent's activities are not so onerous as to require such a blanket provision. Cf. May Department Stores Co. v. National Labor Relations Board, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; N.L.R.B. v. Geigy Co., Inc., 9 Cir., 211 F.2d 553, certiorari denied 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647. Paragraph 1(c) of the Board's order shall be stricken from the order, and the "Notice to All Employees" found in the "Appendix" to that order shall be amended to conform.

As thus modified the Board's order will be enforced by this Court.

2. The order of the Board requires Respondent to cease and desist from the unfair labor practices found, and, inter alia, from "in any other manner" interfering with the exercise of their statutory rights by its employees. Respondent was further ordered to bargain collectively with the Union; rescind its discriminatory seniority policy; restore pre-strike seniority with certain modifications; offer reinstatement to those discriminated against; make those persons discriminated against whole for any loss of pay caused by the policy; make records available to agents of the N.L.R.B. to determine the amount due to discriminatees and to post the notice attached to the order.