## NATIONAL LABOR RELATIONS BOARD
v.
## RETAIL CLERKS INTERNATIONAL ASS'N, A. F. L. et al.
### No. 12434.

United States Court of Appeals
Ninth Circuit.
April 2, 1954.

Bone, Circuit Judge, dissented in part.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Frederick U. Reel, Robert G. Johnson, Attys., N. L. R. B., Washington, D. C., Louis S. Penfield, Albert M. Dryer, Attys., N. L. R. B., San Francisco, Cal., for petitioner.

Roland C. Davis, J. D. Burdick, Carroll, Davis & Freidenrich, San Francisco, Cal., S. G. Lippman, Gen. Counsel, Retail Clerk's International Ass'n, Chicago, Ill., James F. Galliano, Oakland, Cal., for respondents.

Elisha Hanson, Washington, D. C., Willard S. Johnston, George H. Johnston, Orrick, Dahlquist, Herrington & Sutcliffe, San Francisco, Cal., for Safeway Stores, Inc., amici curiae.

Before BONE, ORR and POPE, Circuit Judges.

POPE, Circuit Judge.

Respondents are Retail Clerks International Association, AFL (herein "International"), Retail Clerks' Union Local 648, AFL (herein "Local"), which is an affiliate of International, and certain officials of those labor organizations. From 1937 until 1948 Local held collective bargaining contracts with Safeway and most of the other retail grocery store operators in San Francisco County. Local represented and its contracts covered all the employees in these stores with the exception of butchers. In the summer of 1948, during the course of negotiations with Local for renewal of the existing bargaining agreement, Safeway for the first time sought to have its "location managers" excluded from the coverage of the new agreement. There was one location manager in charge of each of Safeway's stores. He was the sole representative of management in the store and as such had supervisory powers and duties, but he also

performed, along with the rank and file food clerks (herein "clerks"), many non-supervisory tasks as a routine part of his work day.

When Local refused to assent to the exclusion of location managers from the new collective bargaining agreement, Safeway on December 31, 1948, filed unfair labor practice charges with the National Labor Relations Board against Local and International. The Board issued a complaint charging Local and International with refusing to bargain collectively, in violation of § 8(b) (3) of the National Labor Relations Act, as amended.[1] On September 29, 1949, after the hearing on the complaint had begun, a settlement was negotiated by and between Local, International, Safeway, and General Counsel for the Board.[2] As a part of this settlement the parties entered into a stipulation which, so far as here material, provided as follows:

> "All employees in the grocery departments of the 71 Safeway Stores in San Francisco County, excluding location managers and any other supervisory employees as defined in the Act, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act. Said employees are, and have been since before 1948, represented exclusively for collective bargaining by Respondent International and its agent, Respondent Local, both of whom are labor organizations within the meaning of Section 2(5) of the Act."

As a part of the same settlement the Board issued an order, with the consent of all parties, which provided in pertinent part as follows:

> "Retail Clerks International Association, AFL, and Retail Clerks Union Local 648
> "1. Shall not:
> *    *    *    *    *
> (b) Refuse to bargain collectively with Safeway for the employees in the unit described in paragraph IV of the stipulation [above quoted] by insisting or demanding as a condition to such bargaining that Safeway bargain collectively for supervisory employees within the meaning of Section 2(11) of the Act."

The Board subsequently petitioned for enforcement of its order and on January 14, 1950 this court, with the consent of International and Local, entered an enforcement decree.

Thereafter and on May 19, 1950 the Board petitioned this court to adjudge respondents in civil contempt on the ground that they had refused to bargain for clerks by demanding as a condition to such bargaining that Safeway bargain collectively for its location managers. After our remand of the cause to the Board for findings on the question whether location managers were "supervisory employees" within the meaning of the Act, see 186 F.2d 371, the case was returned to this court in October of 1952. Thereafter (on March 31, 1953), we handed down our opinion and entered a decree on the same date holding respondents in contempt. See 203 F.2d 165. We granted a rehearing, limited to the questions which are here discussed.[3] In our previous opinion we disposed of certain procedural problems

---

**1.** § 8(b) (3) of the Act reads as follows:
"(b) It shall be an unfair labor practice for a labor organization or its agents——
*    *    *    *    *
"(3) To refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a)". 29 U.S.C.A. § 158(b) (3).

**2.** The Board proceeding involved several other local retail clerks' unions in north-

ern California, who were also parties to the settlement. The other unions are not, however, involved in this contempt proceeding.

**3.** "The rehearing shall be limited to the questions whether the following demands, made by respondents subsequent to the enforcement decree of this Court of January 14, 1950, and in the course of negotiation for a bargaining contract covering the employees in the bargaining

which had arisen and we also sustained the Board's finding that location managers are "supervisory employees" within the meaning of the Act. Those questions will not be reconsidered in this opinion.

Respondents made the following demands in the course of bargaining for a clerks' contract:

1. That the agreement, if it did not cover all employees who performed clerks' work, should not contain a no-strike clause, unless such a clause contained suitable guarantees protecting clerks from loss of work or "against encroachments and abuses of union conditions on the job;"

2. That the agreement contain a clause requiring Safeway to fill vacancies in location managers' positions from the ranks of the clerks;[4]

3. That the agreement contain a clause providing that no location manager or any other supervisor employee should perform clerks' work under terms and conditions of employment less favorable to the union than those provided in the clerks' contract; or, in the alternative,

4. That the agreement contain a clause providing that no location manager or any other supervisory employee should perform clerks' work.[5]

In our former opinion, 203 F. 2d at page 169, we said: "There is no question that Local and International did impose as a condition to their bargaining on behalf of clerks the bargaining by Safeway for location managers. Respondents have admitted to demanding freedom on the part of the clerks to strike if location managers are not provided for in the bargaining agreement; that persons doing the work of clerks (which would include location managers for part of their work day) should have the benefit of any collective bargaining agreement that should be entered into, or in the alternative that location managers should not do the work of clerks; and that location managers should be selected from among the clerks. And it is further admitted that respondents called a strike when its demands were not met. It will not do to say that the demands made were solely in the interests of the clerks in the appropriate bargaining unit. The effect of our decree was to prohibit all attempts of respondents to exact concessions from Safeway as to supervisory employees as the price of reaching an agreement as to the terms and conditions of employment of clerks. We think it too plain for argument that respondents' demands flew directly in the face of this prohibition." We think that what we there

unit described in paragraph IV of the stipulation in case No. 20–CB–43, constitute violations of the said decree of this Court:

"1. The demand that a no-strike clause be eliminated from the proposed bargaining contract.

"2. The demand that no location manager shall perform the same work as that performed by the employees in the above stated bargaining unit, sometimes called 'clerks' work', under terms and conditions of employment less favorable than those provided in a bargaining contract covering those within the said unit; or, in the alternative, that no location manager shall perform 'clerks' work'.

"3. The demand that location managers shall be selected from among the employees in the said bargaining unit."

4. There was some argument between the parties on rehearing as to whether this demand was ever in fact made. The demand admitted by respondents was in these words: "In each grocery store or department there shall be one clerk designated as a manager." The Board and Safeway took the position that this required Safeway to select its managers from the ranks of clerks. In an affidavit filed herein, C. H. Jinkerson, Secretary-Treasurer of Local and one of the respondents, similarly interpreted this demand.

5. On rehearing respondents argued that this fourth demand was put forth as a substitute for, and not as an alternative to, their third demand. We think the record shows that it was made as an alternative. The question cannot affect the decision in the case in any event.

said was correct, and this for several reasons.

First of all, there is the plain language of the decree. By that decree it was directed that the respondent unions should not "refuse to bargain collectively with Safeway for the employees in the unit described \* \* \* by insisting or demanding as a condition of such bargaining, that Safeway bargain collectively for supervisory employees. \* \* \* " The position which the unions have taken upon the rehearing of this matter discloses a misapprehension as to what the quoted paragraph says: The unions say in effect "Our demands do not constitute bargaining by us for location managers or any effort at such bargaining but they represent bargaining solely in the interest of the clerks." Indeed, they say, "we are not only willing but, frankly, somewhat eager to relinquish bargaining for Safeway location managers altogether and under all circumstances."

What the quoted paragraph says is plainly enough that the unions shall not when bargaining with Safeway as to the conditions of employment of the clerks demand that Safeway bargain for the conditions of employment of the location managers. In other words, the unions may bargain for the clerks but they cannot attach as a condition thereto that Safeway shall bargain for the supervisory employees.

The four demands of the unions above listed require Safeway to enter into certain bargains for the supervisory employees and relating to conditions of their employment. On the face of the decree such demands are in violation of the decree. They are demands covering a great range of the supervisors' employment and working conditions. They relate to who may be employed as supervisors; they relate to the conditions under which the supervisors shall work, and they relate to what work the supervisors may do. That is calling for bargaining by Safeway for its supervisory employees.

A second reason why we adhere to our first decision is that it interprets the Board's order in a manner calculated to effect the policies which Congress had in view in enacting the Act, 29 U.S. C.A. § 151 et seq. Where possible the Board's order should always be so construed, for the Board, constituted for that very purpose, has presumably sought to accomplish those objectives. When the Act's objectives as respects supervisory employees are examined, particularly in the light of its legislative history, there can be no doubt at what the Board was aiming in the prosecution of its complaint against these unions and in the procuring of the Board's order and the court's decree. Both were phrased in the language of the complaint.

A primary objective of § 2(11) of the Act, to which reference is made in this paragraph of the decree, was to assure to the employer his right to procure the loyalty and efficiency of his supervisors and managers. The reports which accompanied the legislative bill which Congress enacted into the Labor Management Relations Act of 1947, made this abundantly clear.[6] The re-

---

**6.** "Management, like labor, must have faithful agents.—If we are to produce goods competitively and in such large quantities that many can buy them at low cost, then, just as there are people on labor's side to say what workers want and have a right to expect, there must be in management and loyal to it persons not subject to influence or control of unions, not only to assign people to their work, to see that they keep at their work and do it well, to correct them when they are at fault, and to settle their com-

plaints and grievances, but to determine how much work employees should do, what pay they should receive for it, and to carry on the whole of labor relations.

\* \* \* \* \*

"Supervisors are management people. They have distinguished themselves in their work. They have demonstrated their ability to take care of themselves without depending upon the pressure of collective action. No one forced them to become supervisors. They abandoned the 'collective security' of the rank and

ports were specific as to certain evils which the congressional committees thought they could avoid by excluding foremen and other supervisors from the operation of the Labor Act. Much emphasis was laid upon the desirability of assuring their independence of unions of the rank-and-file. It was noted that what had been happening in respect to unionizing of foremen under the former Act was "bad for output" and hurt the free flow of commerce which the Act was intended to promote.[7] The committees noted the tendency to subservience by the foremen and their associations to unions of the rank-and-file, and how as a practical matter the rank-and-file unions were dictating what the foremen might or might not do.[8]

The conduct of the unions here furnishes a fair illustration of the sort of thing Congress was trying to get away from when it made these amendments with respect to supervisors. It may fairly be said that an employer would be sharply restricted in his opportunity to obtain loyal and efficient supervisors if he is to be limited to selecting them from a rank-and-file union whose mem-

bers, by habit and training, may have acquired an anti-employer bias. Here the union proposes to dictate, through its bargaining, what the supervisors may or may not do. Congress took note (see note 8, supra) of how some foremen had adopted a policy of refusing to enter and protect the struck plants of their employers. Here the prohibition against a supervisor doing clerk's work would, if enforced, serve to close a store up tight in case of a strike. Congress obviously did not contemplate that a union should be able to exercise that much power. In view of the legislative history of the present Act we must construe the consent decree as having been framed with a view to avoiding just this sort of encroachment upon the rights of an employer to select and control his supervisors and to obtain their loyalty and cooperation.

Finally, we cannot close our eyes to the realities of the food store business. It is but common knowledge that what is proposed here is no way to run a grocery store. We know judicially that in every store, large or small, all the clerks may be busy when another cus-

file voluntarily, because they believed the opportunities thus opened to them to be more valuable to them than such 'security'. It seems wrong, and it is wrong, to subject people of this kind, who have demonstrated their initiative, their ambition and their ability to get ahead, to the leveling processes of seniority, uniformity and standardization that the Supreme Court recognizes as being fundamental principles of unionism. (J. I. Case Co. v. National Labor Relations Board, 1944, 321 U.S. 332 [64 S.Ct. 576, 88 L.Ed. 762]. It is wrong for the foremen, for it discourages the things in them that made them foremen in the first place. For the same reason, that it discourages those best qualified to get ahead, it is wrong for industry and particularly for the future strength and productivity of our country." House Report No. 245, on H.R. 3020, Legislative History of the Labor Management Relations Act, 1947, Vol. 1, p. 307.

7. "If management is to be free to manage American industry as in the past and to produce the goods on which depends our

strength in war and our standard of living always, then Congress must exclude foremen from the operation of the Labor Act. * * *" Legislative History, supra, p. 306.

8. The House Report alluded to documentary evidence which showed "a subservience of the association to unions of the rank and file that is rare among unions." It stated: "The evidence shows that foremen's unions are, and must be, wholly dependent upon rank-and-file unions and under constant obligations to them. * * * The [foremen's] association has adopted a formal 'policy' forbidding its members, when the rank-and-file unions strike, to enter the struck plants and protect and maintain them without the consent of the rank-and-file unions." Legislative History, supra, pp. 306, 307. The Senate Report stated: "Disciplinary slips issued by the underground supervisors in these mines have fallen off by two-thirds and the accident rate in each mine has doubled." Legislative History, supra, p. 410.

tomer walks in. If at that moment the manager approaches the customer with an inquiry as to what the customer requires, has the manager performed clerk's work? No matter how many pages in the union's contract are filled with definitions of "clerk's work", in the practical operation of a grocery store there would be hourly occasions for dispute as to the meaning of the term, from what words the manager may address to a customer, to where he may stand, or what he may do in or about the merchandise.

Again, Safeway cannot operate its stores without regard to its competitors. If its competitors are permitted to operate their stores in the good old fashioned way, whereby the owner or his representative steps forward and waits on trade during busy periods, Safeway cannot without great loss to itself agree to the restrictions upon management here demanded. The record shows that many of its stores are relatively small with no more than three employees, one of whom is a butcher. The proposal is no more than a demand for a most inefficient system of limiting the manager to duties which he can probably perform in a couple of hours each day with enforced idleness for the remainder of the time. The whole proposal seems so impracticable and so unreasonable that it demonstrates a refusal to conform to the provisions of the consent decree.

As we previously said, it will not do to say that the demands were made solely in the interests of the clerks. It is apparent that a union acting in the interests of its own members could undertake to meddle in matters properly belonging to management in a multitude of ways; but the fact that the union is doing so in its own interest does not excuse it from a charge of refusal to bargain in good faith or a charge of violation of a decree of this character.

We therefore hold respondents in civil contempt of this court. A decree will be entered adjudging respondents in contempt and allowing them 60 days in which to purge themselves of their contempt by making a satisfactory showing to this court that the demands which we have held to constitute a violation of the decree of this court of January 14, 1950, have been withdrawn. Upon receipt of such showing, or upon expiration of the time granted therefor, the court will enter such further order as may then be appropriate.

BONE, Circuit Judge (dissenting).

I concur in the result reached in Judge Pope's opinion insofar as it holds respondents in contempt for making the third of the four demands listed in that opinion. I think that particular demand was that Safeway bargain "for" supervisory employees (within the meaning of our decree) and was therefore violative of our decree. I have become convinced, however, that in our former opinion, 203 F.2d 165, we were wrong in holding respondents in contempt for making the other three demands set out in Judge Pope's opinion. In pointing up the differences between my present views and those of my associates I shall focus my attention on the last of respondents' four demands—the demand that location managers be prohibited from doing clerks' work. This demand has become the key item of dispute between respondents and Safeway.

The nub of our former opinion, still adhered to by my associates, was the following interpretation of our decree: "It will not do to say that the demands made were solely in the interests of the clerks in the appropriate bargaining unit. The effect of our decree was to prohibit all attempts of respondents to exact concessions from Safeway as to supervisory employees as the price of reaching an agreement as to the terms and conditions of employment of clerks." 203 F.2d at page 169.

Thus we read the decree's prohibition against demands that Safeway bargain "for" supervisory employees as forbidding demands that Safeway grant "concessions" as to such employees, and we

examined respondents' demands to determine whether they *in any way affected* supervisors. If this is the meaning of the decree, then there is no doubt that respondents' "no-clerks'-work" demand, and their other demands as well, constitute contempt, as the majority now holds. The demands quite clearly require "concessions" from Safeway as to location managers and "affect" such employees in some manner.

I now think this interpretation of our decree is erroneous and cannot be justified. A brief reference to the facts which gave rise to the entry of our decree will serve to point up the error. Both the decree and the order of the Board which it enforces were issued with the consent of respondents. The order of the Board was a part of a settlement of a 1949 dispute between Safeway and respondents. The dispute, in brief, was this: Safeway for the first time demanded that its location managers be separated from its clerks for collective bargaining purposes; respondents, on the other hand, insisted that location managers be included in the clerks' bargaining unit and covered by the clerks' bargaining contract, as had been the practice in prior years. The settlement of the dispute was a victory for Safeway: it was stipulated that clerks, and clerks only, constituted the appropriate bargaining unit, and the Board's order prohibited respondents from demanding, as a condition to bargaining for clerks, that Safeway bargain for managers. *The settlement, and the Board's order (now embodied in our consent decree) which was a part of that settlement, had but one purpose namely, to prevent respondents from bargaining jointly for both location managers and clerks, as had been the prior practice.*

Thus our decree cannot, consistently with its purpose, be interpreted so as to prohibit respondents from making good faith demands *in the interests of the clerks,* even though, as commonly occurs in collective bargaining for rank and file

employees, such demands might occasionally touch upon the terms and conditions of employment of supervisory employees in some particulars. The decree, properly interpreted, in no way restricts respondents in their bargaining for clerks. Respondents are not required to scrutinize each contemplated clerks' contract demand to see if it in any way *affects* location managers, with punishment for contempt as a possible consequence if they do not. The decree's prohibition against demands that Safeway bargain "for" location managers extends only to demands that Safeway bargain *with respondents, as representatives of managers, in the interests of and for the benefit of managers.* What is prohibited by our decree are attempts of respondents to use their status as representatives of the clerks to force Safeway to accept demands pressed by them *for and on behalf of managers.*

*This interpretation* of our decree requires a quite different approach to the question whether in making the no-clerks'-work demand respondents were guilty of contempt. The question is not, as the majority would have it, whether that demand *affects* the terms and conditions of employment of managers in some manner. Rather, the question is whether the demand constitutes *bargaining for and on behalf of managers.* I think it is quite clear that it does not. On the contrary, the demand on its face constitutes bargaining *for clerks* and *against managers.* Its objective is to take work from the managers and give it to the clerks. Such an objective is often sought in collective bargaining for rank and file employees. *All the parties agree* that it is very common for collective bargaining agreements covering rank and file employees to restrict the non-supervisory work of management personnel. Looking no further than the terms of such a demand, then, it would in no sense seem to be violative of our decree. Whether the demand was nonetheless bad because not made in good

faith raises a wholly different question, which will be put off for the moment.

The majority seek to bolster their holding with the rule that our decree should be interpreted so as to effectuate the *policy* of the Act. Apparently this rule is extracted from our case of N. L. R. B. v. American Potash & Chemical Corp., 9 Cir., 113 F.2d 232, 234–235, 129 A.L.R. 874. A brief look at that case will reveal that it lays down no such broad rule as that here relied upon by the majority. What that case says, in effect, is that a decree should be interpreted harmoniously with the Act, a proposition with which I have no quarrel. That does not at all mean that this Court may range through the Act and its history, deduce the "policy" of the Act therefrom, and then read such policy into a decree so as to give it a very different and much broader meaning than it had when entered. It is probably true that the purpose of the Board in issuing the order enforced by us was to serve the Act's purpose of assuring to employers the undivided loyalty of their supervisory personnel, but the order and our enforcement decree undertook to achieve that end in only one way, namely, by prohibiting respondents from attempting to *bargain jointly* for both location managers and clerks. The question whether respondents have done what *the decree* prohibits is the only proper subject of concern here. Moreover, I cannot see that the principle of "undivided loyalty" of supervisors is in any way served by holding respondents' no-clerks'-work demand violative of our decree. Indeed, it would seem that to prohibit location managers from doing clerks' work would tie them more closely to Safeway's management by eliminating that community of interest between these managers and the clerks which flows from doing the same kind of work.

There is next the question whether respondents in fact made the no-clerks'-work demand *in good faith* on behalf of the clerks, or whether they pressed it for the sole purpose of forcing Safeway to accept the alternative (which respondents have at all times kept open to Safeway) of bargaining with respondents *for* location managers. If the latter interpretation of respondents' conduct is correct, then they have indeed refused to "bargain collectively" for clerks, under the applicable "good faith" test of bargaining,[9] by demanding as a condition to such bargaining that Safeway bargain *for* location managers, in violation of our decree.

The question, then, is whether the making of the no-clerks'-work demand amounts to a refusal to bargain in good faith. Our authority under the Act to determine when a bargaining demand is proper, or what is a "proper" subject of bargaining, is very limited. We cannot compel respondents to "agree to a proposal or require the making of a concession". § 8(d) of the Act. We are not allowed to "sit in judgment upon the substantive terms of collective bargaining agreements." National Labor Relations Board v. American Nat. Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027. The Court of Appeals for the Fifth Circuit, in holding that an employer had not violated a decree requiring it to bargain in good faith, had this to say:

> "The law requires good faith bargaining with the purpose of reaching an agreement. It does not require that any particular form of

---

**9.** Section 8(d) of the Act reads as follows: "(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: * * *".

agreement be reached. The respond- ents did not ask a single thing of the union that it could not, if it wanted to, have agreed to. * * * It is not for us to determine whether the proposals of the union or those of the respondents would have been best for employer and employee. It is sufficient for us to determine that respondents have not, in contempt of this court's order, failed and refused to bargain." N. L. R. B. v. Whittier Mills Co., 5 Cir., 123 F.2d 725, 728.

At the same time I recognize that an absence of good faith in bargaining may sometimes be shown by patently unreasonable demands as well as by other circumstances. See N. L. R. B. v. Dalton Telephone Co., 5 Cir., 187 F.2d 811; N. L. R. B. v. George P. Pilling & Son Co., 3 Cir., 119 F.2d 32, 38. If respondents' no-clerks'-work demand, viewed in its setting, was wholly unreasonable and unprecedented as a matter of collective bargaining practice generally, or if it was such that it could obviously never be accepted by Safeway, or if it clearly served no legitimate interest of the clerks, then I would agree with the majority that in pressing it respondents failed to bargain in good faith. But unless the demand can be said to have reached those extremes, it is not for this court to pass upon its merits or speculate about respondents' motives in pressing it.

I do not think the no-clerks'-work demand, tested by these standards, amounts to a refusal to bargain in good faith. In their opinion the majority completely overlook the change wrought in the bargaining relationships between respondents and Safeway by the Board's issuance of its order against respondents and our entry of a decree enforcing that order. The system of store operation described in Judge Pope's opinion existed at a time when all of Safeway's managers and clerks were represented by the same union, were in the same bargaining unit, and were covered by the same bargaining agreement. In such circumstances there was no reason for respondents to concern themselves with the question whether location managers should or should not do clerks' work. So long as respondents bargained jointly for both managers and clerks, they were in a position to protect and further the interest of both.

The situation was quite different when respondents first made their no-clerks'-work demand of Safeway. At that time respondents were subject to our consent decree which required them to bargain separately for clerks without injecting demands on behalf of managers into such bargaining. While respondents represented a majority of Safeway's location managers at that time, there was no assurance that they would continue to do so. There are no unfair labor practices against supervisors. See §§ 2 (3) and 14(a) of the Act; Texas Co. v. N. L. R. B., 9 Cir., 198 F.2d 540. Safeway was free to discourage the union membership of its managers by such means as were available to employers before the passage of the Wagner Act. Moreover, Safeway could not be compelled by law to bargain with its managers and there were strong indications that Safeway was not inclined to do so except on its own terms.

How did all this affect clerks? Managers had always done a considerable amount of clerks' work. There was no assurance that they would not be given more of such work when not covered by a bargaining agreement. It is not unusual to work supervisors long hours at a flat salary, and such a practice might well have proved profitable to Safeway. Nor is it unheard-of for employers to attempt to create additional "supervisory" jobs so as to place more of their employees outside the protection of the Act. See West Texas Utilities Co., Inc., 94 N.L.R.B. 1638; Jackson Daily News, 90 N.L.R.B. 565. In view of Safeway's very determined stand against bargaining for managers, there may have been a not unreasonable suspicion that Safeway was seeking more than the "undi-

vided loyalty" of its managers. I do not presume to say what Safeway's intentions were; I am here concerned only with what respondents, as representatives of the clerks, might reasonably have anticipated. In sum, they might have apprehended that a substantial part of the work of clerks would be taken up by supervisory personnel not organized for collective bargaining purposes.

In this context I cannot see that it was unreasonable for respondents to seek to restrict the "clerks' work" of managers. As I have stated above, restrictions on the non-supervisory work of management personnel are commonly found in collective bargaining agreements covering rank and file employees in like circumstances all over the country. *The Board and Safeway concede this.* And the fact that such restriction is a common and traditional subject of collective bargaining is in itself a persuasive, if not conclusive argument that respondents' *demand* for such restriction is within the sphere of collective bargaining which the Act meant to leave free from intrusion by either the Board or the courts. National Labor Relations Board v. American Nat. Ins. Co., supra, 343 U.S. at pages 405–408, 72 S.Ct. at pages 830–832. In the case just cited the Supreme Court said that "the term 'bargain collectively' as used in the Act 'has been considered to absorb and give statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States.'" 343 U.S. at page 408, 72 S.Ct. at page 831.

If by making the no-clerks'-work demand respondents were guilty of a refusal to bargain in good faith it must be because, in the particular circumstances of this case, the demand seeks to impose such an extreme burden on Safeway that respondents must know that Safeway not only will not, but cannot possibly accept it. The majority seem to take the view that the demand is of that character.

I am not convinced that what respondents seek would impose an impossible burden on Safeway. The majority say

that to prohibit managers from doing clerks' work is "no way to run a grocery store", and that it would place Safeway at a severe competitive disadvantage. The argument seems to proceed on the premise that the only profitable way to run a grocery store is the way grocery stores have been run in the past, a proposition that is by no means a matter of "common knowledge."

I cannot agree with the view that the no-clerks'-work demand is "beyond all reason." This demand should be considered in light of a "bulletin" dated March 17, 1948, and issued to location managers by Safeway's President, Lingan Warren. In that bulletin Mr. Warren stated: "A manager is not really managing unless he spends most of his time in planning the work, training and directing others in its accomplishment, and reviewing over-all operations to see that the desired results are obtained in the desired manner." He then lists a number of such supervisory functions and concludes: "It should not be too difficult to convince a location manager that he can't do a food clerk's work and these things too."

Having in mind this interesting pronouncement of Safeway's highest officer, I cannot subscribe to the view that the no-clerks'-work demand is "impossible." To take clerk's work away from the managers might cause difficulty, and perhaps considerable difficulty to Safeway, but the same is also true of many union demands on employers which are not, for that reason, held to amount to a refusal to bargain in good faith. Though protesting vigorously against the demand, even Safeway does not assert that acceptance of it would create a situation that could not be met.

Finally, the majority do not know and I do not know precisely *how far* respondents' no-clerks'-work demand seeks to restrict location managers in doing clerks' work. We do not know, for example, whether respondents would allow managers to do clerks' work when emergencies demanded it or to the extent

necessary to demonstrate proper work methods to untrained clerks. Provisions for such eventualities are commonly found in bargaining contract clauses restricting the non-supervisory work of management personnel. The term "clerks' work" as used in respondents' demand has never been defined. An agreement between respondents and Safeway, dated July 24, 1950, which is apparently still in effect, provides that if the no-clerks'-work demand is held valid by this Court, then the clerks' contract shall contain such a clause, and the parties "shall agree upon and include in said contract a definition of the term 'clerks' work' as used [t]herein." Precisely what work is or is not to be permitted location managers is apparently, a question which has been reserved for the bargaining table, and properly so.

I think that by holding respondents' no-clerks'-work demand violative of our decree and ordering it withdrawn this Court invades the sphere reserved to the bargaining process. It may be, as Safeway seems to indicate, that to permit respondents to press this demand will force Safeway to return to bargaining jointly for managers and clerks, the practice which obtained before this long litigation was begun. It may be (although we cannot know) that Safeway will choose this as an alternative to accepting the no-clerks'-work demand. But that possibility should not affect our decision in the present posture of this case. It is not the province of this Court, as I see it, to insure that Safeway will have achieved its goal, but only to interpret and enforce our decree. That decree did not *guarantee* Safeway a clerks' contract negotiated on its own terms.

I see no point in prolonging this already lengthy opinion with a discussion of respondents' first and second demands. Suffice it to say that I think those demands, too, were legitimate bargaining demands on behalf of the clerks and were therefore not violative of our decree.