**RICHFIELD OIL CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 12483.

United States Court of Appeals
District of Columbia Circuit.

Argued May 5, 1955.

Decided Jan. 16, 1956.

Writ of Certiorari Denied
April 23, 1956.

See 76 S.Ct. 695.

Wilbur K. Miller, Circuit Judge,
dissented.

Mr. Gregory A. Harrison, San Francisco, Cal., with whom Mr. Marion B. Plant, San Francisco, Cal., was on the brief, for petitioner. Mr. Donald D. Connors, Jr., San Francisco, Cal., also entered an appearance for petitioner.

Mr. Duane B. Beeson, Atty., National Labor Relations Board, of the bar of the Supreme Court of California, with whom Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, was on the brief, for respondent. Mr. Robert G. Johnson, Atty., National Labor Relations Board, also entered an appearance for respondent.

Messrs. William B. Barton and Anthony P. Alfino, Washington, D. C., filed a brief on behalf of The Chamber of Commerce of the United States, as *amicus curiae*, urging reversal. Mr. Milton A. Smith, Washington, D. C., also entered an appearance for The Chamber of Commerce of the United States.

Mr. Lambert H. Miller, Washington, D. C., filed a brief on behalf of National Association of Manufacturers of the United States of America, as *amicus curiae*, urging reversal.

Messrs. Milton C. Denbo, Washington, D. C., and Thomas E. Shroyer, Cleveland, Ohio, filed a brief on behalf of American Retail Federation, as *amicus curiae*, urging reversal.

Before WILBUR K. MILLER, BAZELON and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Petitioner "Richfield" asks us to review and set aside, and the Board seeks enforcement of, the Board's order issued

against Richfield October 18, 1954. The Board had found that Richfield violated § 8(a) (5) and (1) of the National Labor Relations Act [1] by refusing to bargain with Oil Workers International Union, CIO, with respect to an employee stock purchase plan which the company had unilaterally put into effect as of July 1, 1953.

Richfield produces, refines and sells petroleum products in interstate and foreign commerce and employs about 5,000 employees. The company engages in collective bargaining with some 11 labor organizations. Since April 1945, and at all times material to the issue raised here, Oil Workers Union has been the exclusive collective bargaining representative of about 2,000 production, construction and maintenance Richfield employees.

On April 14, 1953, Richfield announced to its employees a voluntary "Stock Purchase Plan" of the deferred distribution type. The Plan had not previously been discussed with the Oil Workers Union, although there was then in full force and effect a collective bargaining agreement with that Union. The latter thereupon wrote as of April 2, 1953, expressing its desire "to meet with the Richfield Oil Corporation for the purpose of negotiations on the proposed 'Stock Purchase Plan.'" Richfield declined such negotiations, insisted that the Plan had been "finally adopted" subject only to clearance with the Commissioner of Internal Revenue, but expressed willingness to meet with the Union "for the purpose of explaining the Plan." Meetings were accordingly held on May 7, 1953, and again on May 13, 1953, when the Union proposed certain modifications embodied in a "Plan" it submitted, purposed "to encourage employees to provide additional security for their retirement through systematic savings." The Union sought to establish the plan by *contract* to be ratified by the Union, to enlarge the group of eligibles, to protect Union members while in authorized leave status, to prescribe certain safeguards in the event of strike or lockout, to relate various types of "service" time to certain situations otherwise covered in the outstanding collective bargaining agreement, and in other respects to vary the Richfield plan. After Richfield flatly advised that it "did not consider the Stock Purchase Plan to be a proper subject of collective bargaining," the Union charged Richfield with unfair labor practices.

The complaint recited that "the Union requested the Respondent to bargain collectively with it in respect to the Respondent's unilaterally promulgated Stock Purchase Plan as exclusive bargaining representative" of the employees [2] in its unit, and Richfield's refusal so to bargain. Unfair labor practices accordingly were alleged.

The facts were stipulated for the purposes of the hearing. Attached as exhibits were the exclusive bargaining agreement then in force,[3] certain amendments thereto, Richfield's announcement, the Plan, a retirement plan and a retirement annuity plan concluded by agreement in 1944, and various other documents or correspondence. The retirement plan benefits were provided by a group annuity contract, paid for by Richfield, and were in addition to those provided under an "Employees Group Insurance Plan" and by the Social Security Act, 42 U.S. C.A. § 301 et seq. The retirement annu-

1. Act of July 5, 1935, 49 Stat. 452, as amended 1947, 61 Stat. 140, 29 U.S. C.A. § 158.

2. By December 1, 1953, 2,547 out of 3,-318 eligible employees had become participants in the Plan, including 820 of the 1,340 eligibles represented by the Union.

3. The agreement dealt in detail with many employment problems including trans-

portation and travel time, holidays, vacations, sick leave, and leaves of absence. Under the heading "Benefits," we read: "This agreement shall in no wise affect the status of employees on whose behalf it is made with respect to benefits derived or to be derived by employees as a whole from membership in any group insurance, stock purchasing plans or pension funds."

ity plan for Richfield employees was paid for by joint contributions of Richfield and its employees, with participation optional with each eligible employee.

Adequate details of the Stock Purchase Plan can be gleaned from the findings, included in the Board's "Decision and Order." [4]

One member dissenting, the Board majority concluded on the record as a whole that the Plan represents a mandatory subject of collective bargaining. The opinion said, in part:

> "We think that a common sense, non technical view of the Plan, including its manifest purpose, its unmistakable emphasis upon the long term accumulation of stock for future needs rather than upon stock ownership as such, its requirement that participants be employees, and its provision for benefits which are related to the employees' length of service and amount of wages while participating, compels the conclusion that benefits accruing to employees thereunder represent a part of the compensation or remuneration received by the employees for their labor, differing from their weekly wages only in form and time of payment."

The Board found that the term "wages" comprehends emoluments of value flowing from the employment relationship. In like manner, the Plan, in its objectives and in its operation, was said to affect "conditions of employment." On both predicates the Board overruled Richfield's contention that the Plan is not the subject of compulsory collective bargaining.

Richfield in its brief argues that "no employer can be compelled by law to provide for the acquisition of its own shares by its employees, and the law gives neither to the employer nor to a trade union any right to compel employees without their consent, to buy the corporate shares of their employer, however needy that employer may be." The Company has offered, of its own volition, a plan by which employees will be assisted by Richfield in the purchase of the latter's shares. No one, so far as we can see, has asserted that Richfield can be compelled by law to provide for the purchase of its shares. No one has sought to compel employees, without their consent, to buy Richfield's shares. As a matter of fact, employees who enter upon the Plan, under its terms, may even withdraw from the purchase program at any time. The Plan in its every aspect was conceived and formulated by Richfield itself. We are offered by the language quoted a strange interpretation of the issue as we see it, yet the statement finds counterpart in other arguments offered in the Richfield brief.

For example, "Richfield's plan is offered as something separate from the wage agreement, to afford (as the plan states), an opportunity for employees to invest in the Company's stock, and thereby to promote a close and continuing association with the Company's business. As analysis discloses, *the plan is nothing more than that*," (emphasis added) we are told.

Since analysis is invited we look more closely at the terms proposed.

A Richfield employee having been employed for more than one year and being between the ages of 30 and 65, may at stated dates contribute through regular payroll deductions up to 5 per cent of his normal wage, but not less than $5 per month. Richfield then promises to contribute regularly an amount equal to one-half of the employee's monthly contribution. "The Company will make an annual contribution of a sum based upon the ratio of its profits to invested capital which will adjust the total monthly contributions made by the Company to the following schedule." Then, having specified that "profits" shall mean the Company's net income after taxes for the preceding calendar year, Richfield in its schedule shows that its annual contribution will run from 50 per cent to 75 per

4. 110 N.L.R.B. 356 (1954).

cent. No cash or stock is to be distributed to anyone while a member of the Plan, but at or after age 55 a man may receive all cash and stock credited to his own member account, representing his contributions, and to a "trusteed" account, representing the Company contributions. If upon *termination of service* of less than 10 years, a man withdraws before age 55 except because of death or defined disability, he may receive all cash and stock credited to his "member" account, but only a reduced percentage of the same credited to his trusteed account, prorated according to a schedule of service. If he withdraws from the Plan *while remaining an employee*, an employee may receive only the cash and stock credited to his own member account, and, irrespective of age, or years of membership in the Plan, he will not be entitled to any part of the cash or stock in his trusteed account. There are other details which we need not now mention except that the Plan defines "service." That term shall mean the continuous period of time he is an employee of the Company "in accordance with its established policy." The Plan says: "Its continuity shall not be deemed broken during any period of authorized leave of absence or during any layoff period not exceeding the consecutive days prescribed by the Company's policy when the layoff occurs. Its continuity shall be immediately broken by discharge, resignation or layoff exceeding the prescribed period."

Enough has been said on this point to demonstrate that the Plan is something "more than that" argued to us. Certainly "continuity" of uninterrupted service means that each participating employee will receive from the Company an emolument equal to at least 50 per cent of his own contributions if the Company's net earnings reach only 11 per cent per annum, while his emolument for each additional per cent of net profits increases 5 per cent up to a maximum of 75 per cent of the employee's contributions. If that is not tantamount to a wage incentive program for uninterrupted service, it should at a minimum, cause any employee, all eligible participating employees, substantial concern as to what happens should there be a strike. The Plan is silent on the point. If 68 per cent of the Company's eligible employees are participating in the Plan, and they are, they might readily consider themselves ill-advised to take any steps which would disentitle them to receive Company contributions reaching to a possible 75 per cent of their own contributions over the period of participating years.

Perhaps on the foregoing account, the Union sought an agreement that the Plan was not to be impaired or abrogated "as a result of, or solely by reason of, any strike or lockout." In that context the Union proposed a definite understanding that "the effect of any strike or lockout shall be limited to the effect of suspension of contributions by both Company and participants during the periods of strikes or lockouts." The Union, too, asked firm agreement that "Participation by an employee who is granted a Union leave of absence shall not be terminated during such leave but allotments shall be suspended in accordance with the suspension provisions of the 'Stock Purchase Plan.'" The Union suggested further that the Plan run concurrently with its collective bargaining contract, the provisions of the Plan accordingly not be "subject to change as to Employees or Participants represented by the Union," and otherwise as proposed. Apart from clarification of the status of its members in such particulars, it is possible the Union also had in mind the impairment of its status in the eyes of its members as well as other Company employees when, despite its having been chosen as the bargaining representative of its unit with a valid contract in full force and effect, Richfield nonetheless unilaterally and without notice to the Union, announced the Plan. The bland assertion that Richfield contemplated merely an opportunity for employees to invest in the Company's stock would seem to fall short of its conclusion that "The Plan is nothing more than that." (*supra.*)

Richfield argues that bargaining as ordered by the Board "interferes with its legitimate rights under the law, and its exclusive right to control of management." Counsel argues that "There are certain matters concerning which the law does not permit, much less compel, collective bargaining, even when such matters are terms or conditions of employment." There is no provision of the Act which precludes collective bargaining on a deferred payment stock purchase plan such as we have before us. It is difficult to understand that a voluntary agreement to bargain on such a subject can be said to be a matter "which the law does not permit." The parties expressly stipulated before the Board:

"Certain corporations in the oil industry have in the past several years bargained with unions representing their employees with regard to plans under which the employees may engage in stock purchase programs whereby they acquire stock in their corporate employer at terms more favorable than those available to the public generally because of employer contributions proportionate to the employees' contributions to such stock purchase program. Neither Counsel for the General Counsel nor the Charging Party will offer or rely upon the foregoing fact as showing a practice, either in industry generally or in the oil industry of bargaining with respect to such plans; General Counsel and the Charging Party will offer the said fact and rely thereon, for the sole purpose of showing that there is precedent for such bargaining." (J. A. 14–15)

Richfield does not limit its argument to what the law will "permit," to be sure.

As to what the law will "compel" and to illustrate its point concerning non-bargainable proposals, Richfield cites situations involving closed shop provisions not in conformity with requirements of the Act, welfare and retirement fund proposals which unlawfully discriminate, demands for excessive union membership fees and certain featherbedding provisions. The quick answer is that what the Union sought to discuss was none of these things, and nothing like any of them. Of course employers will be protected in their legitimate rights, indeed the Board makes clear that the statutory representative cannot act, and the employer need not bargain with it, except as the representative of the employees as such. Moreover, if the Board should enter and thereafter seek enforcement of an improvident order, except as to a permitted bargainable issue, the courts are still here.[5]

There is involved no threat to Richfield's "maintaining the integrity of its own business ownership, the control of its own management and its own representatives free from union interference." Nor is there substance to the claim that the situation "necessarily and inevitably involves bargaining about the conditions and prerogatives of ownership." Richfield in support of such contentions tells us, and cites cases[6] to prove its point, that when Congress classified supervisors as a part of management, management itself and all management representatives were already beyond a bargaining duty imposed by the Act. On that premise the Board is assailed for its failure to assure management immunity from union interference. Somehow, the claim falls as short of reality as the cases cited fail to deal with the issue here.

**5.** Compare National Labor Relations Board v. Express Pub. Co., 1941, 312 U.S. 426, 437, 61 S.Ct. 693, 85 L.Ed. 930; May Department Stores Co. v. National Labor Relations Board, 1945, 326 U.S. 376, 388, 389 note 10, 66 S.Ct. 203, 211, 90 L.Ed. 145; National Labor Relations Board v. Warren Company, 1955, 350 U.S. 107, 112, 76 S.Ct. 185.

**6.** Packard Motor Car Co. v. National Labor Relations Board, 1947, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040; Texas Co. v. National Labor Relations Board, 9 Cir., 1952, 198 F.2d 540, 542; National Labor Relations Board v. Retail Clerks International Ass'n, 9 Cir., 1954, 211 F.2d 759, certiorari denied, 1954, 348 U.S. 839, 75 S.Ct. 47, 99 L.Ed. 662.

Richfield says that the Board's order will result in violation of the fundamental requirements of the Act and its basic policy by dividing the loyalty of the union between the duty to ownership on the one hand and to employees on the other. Richfield sees conflicting representations between ownership and employee interests, between stockholder employees and non-stockholder employees, and between those employees who aspire to be investors and shareholders and those who do not. It is to be doubted that there are such basic conflicts as Richfield envisions, but if there are, what are we to say in the light of its claim that its own, indeed its whole, purpose in offering the plan is to provide "an opportunity for employees to invest in the Company's stock"? Richfield here relies upon the Bausch & Lomb Optical Co. case, 108 N.L.R.B. 213. A mere reading of the case will disclose that it is totally inapposite to our problem. There, the union had set up a competing business with that of the company for whose employees it proposed to speak. It can scarcely be said that employees as stockholders are analogous to employees as competitors from a bargaining point of view. Where only stockholders are to have the right to be heard, the Union shall have no voice whatever as a statutory representative, the Board emphasized.

In any event, the Union has asked nothing concerning managerial functions. The Plan is limited to open market share purchase. The maximum rate of employee contributions is 5 per cent of salary, yet there are some 4,000,000 shares outstanding, we are told. The bargaining the Union sought involves, not control of the Company, but the status of the offer and of the employees who rely upon it. Richfield invites its employees to become stockholders whether they belong to this Union or not, and seeks to keep them as stockholders by withholding their deferred benefit of Company contributions until as to each employee, all conditions of the Plan shall have been met. To the extent that the Board may rely upon such provisions as stating a "condition of employment" and hence may establish one of the bases upon which its order rests, we think it is correct. Equally Richfield's fears are ill-founded, we suggest, if the Company is correct in its representations to us that "Richfield may terminate the entire plan at will." Section X, if it be controlling, and on this point we do not rule, in part expressly provides: "The Board of Directors of the Company reserves the right to amend or terminate this Plan at any time."

Richfield seeks to pitch its argument on yet additional grounds which may be briefly noted. We are told that the duty to bargain collectively could not have been intended by Congress to cover a "field as significant as that of stock acquisition and ownership." Aside from the fact that Congress never forbade such bargaining, the Company's point is not of the essence of the issue before us. Our question is far more narrowly limited since Congress expressly *has* provided for collective bargaining with respect to wages and conditions of employment. To the Board has been left the determination as to what facts and circumstances spell out "wages" or what situations involve other "conditions of employment." We will presently reach consideration of the case in those very terms.

Meanwhile we note the Company's further claim that the Board's order violates constitutional rights:

(1) by "depriving the employer of freedom and liberty to contract concerning the disposition of its property" in contravention of the Fifth Amendment [7];

(2) by superseding the individual employee's freedom of contract by binding employees to purchase stock

7  But the stock is to be brought in the open market, hence from individual willing sellers, and otherwise the terms of the offer have been fixed by the Company itself.

with funds already earned and owned by them [8]; and

(3) by transcending the authority delegated to the Board because as so exercised, the Board's power may be "so broad as to include the ownership of corporate employers," all without "understandable limitations on its scope"; and besides, the Act as so interpreted, may "invade the field of legislation reserved to the States." [9]

It requires no citation of authority to support the obvious, that in designating a bargaining representative, employees make their choice "for the purpose of negotiating the terms and conditions of their employment".[10] The Union here sought to speak only for its own bargaining unit, as the Act authorizes with respect to "rates of pay, wages, hours of employment, or other conditions of employment." Under the Plan, only a limited, defined class of employees will be eligible to participate, but they must be employees. Their chance to receive from their employment an emolument to be contributed by the Company depends, not only upon their continued service in an employee status over a prescribed number of years, but upon their own contributions up to 5 per cent of their wages or salary. So what is "service" within the meaning of the Plan, or how "wages" shall be determined upon which to base the percentage of possible contributions, or how continuity of status is to be ascertained and preserved, or what effect there may be upon the employees' rights to participate in future benefits in the event of strikes or lockouts, or whether a Union man on Union business may be on leave of absence, or whether "Company policy," undefined, shall solely govern the effect of lay-offs upon the employees' right to future benefits, or what relationship the "Company policy" in such matters shall bear to similar bargainable issues previously resolved in the outstanding collective bargaining agreement with the Union, and comparable problems, may become of great importance in cementing harmonious industrial relations between the Company and its employees. To achieve the purposes of the Act, resolution of issues on any such subject may well further the objectives Congress sought, although we do not decide, in the absence of a record on a particular point, that any special problem inevitably gives rise to a necessity for bargaining. The result in any such situation will depend upon the outcome of bargaining with reference to it, and complete agreement may follow negotiations.

The very fact that Congress has not defined "wages" or "terms" or "other

---

8. But participation in the Plan is entirely voluntary and optional with the employee, just as is participation in the Retirement Annuity Plan, long since established by the Company.

9. But neither the Union's proposed "Memorandum of Understanding" nor its proposed modifications in the Plan looked to "ownership" of Richfield. The Board's order went no farther than that Richfield "Cease and desist from refusing to bargain collectively with Oil Workers International Union, CIO, as the exclusive bargaining representative of its employees in the appropriate unit with respect to its 'Stock Purchase Plan.'" Moreover, in its opinion the Board said:

"At the bargaining table, therefore, the statutory representative cannot act, and the employer need not bargain with it, except as the representative of employees as such, and only with respect to 'rates of pay, wages, hours of employment, or other conditions of employment.'

And, even in these areas, it may be appropriate to point out to those who are inclined to equate an employer's obligation to bargain with a complete and abject submission to every union proposal, the Act, in the words of the Supreme Court, 'does not compel any agreement whatsoever between employees and employers.' [Citing N. L. R. B. v. American Nat. Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027.] On the occasion of stockholder meetings, corporate elections, or any other matter in which only stockholders have the right to be heard, the union has no voice whatever as a statutory representative." 110 N.L.R.B. at 363.

And see § 8(d): "* * * but such obligation does not compel either party to agree to a proposal or require the making of a concession". 29 U.S.C.A. § 158 (d).

10. § 101, 61 Stat. 136 (1947), 29 U.S.C.A. § 151.

conditions of employment" makes it clear that the Board is to deal within its own competence and expertise with the multiple variance of differing aspects of the problems arising in these fields. Then the courts will review and determine ultimately whether or not the Board has acted permissibly and correctly. Thus, we have no difficulty in appreciating the observations of Circuit Judge Woodbury:

"At least, without attempting to mark the outer boundaries of the meaning of the word 'wages' as used in the Act, or attempting to enunciate a generalizing principle for the decision of future cases, (generalization must await the accumulation of a body of decided cases pricking out the line between subject matters within the Act and subject matters outside its scope) we think it can safely be said that the word 'wages' in § 9(a) of the Act [29 U.S.C.A. § 159] embraces within its meaning direct and immediate economic benefits flowing from the employment relationship. And this is as far as we need to go, for so construed the word covers a group insurance program for the reason that such a program provides a financial cushion in the event of illness or injury arising outside the scope of employment at less cost than such a cushion could be obtained through contracts of insurance negotiated individually." [11]

So, too, we can here see that the deferred distribution program as outlined in the Plan offers emoluments of value comprehended within the term "wages," and accrued from the employment relationship.[12]

Likewise, we agree with the Board opinion that the Plan comes within the "conditions of employment" category. It would add nothing to go beyond the views expressed by the Seventh Circuit:

"Suppose that a person seeking employment was offered a job by each of two companies equal in all respects except that one had a retirement and pension plan and that the other did not. We think it reasonable to assume an acceptance of the job with the company which had such plan. Of course, that might be described merely as the inducement which caused the job to be accepted, but on acceptance it would become, so we think, one of the 'conditions of employment.' Every day that such an employee worked his financial status would be enhanced to the extent that his pension benefits increased, and his labor would be performed under a pledge from the company that certain specified monetary benefits would be his upon reaching the designated age. It surely cannot be seriously disputed but that such a pledge on the part of the company forms a part of the consideration for work performed, and we see no reason why an employee entitled to the benefit of the plan could not upon the refusal of the company to pay, sue and recover such benefits. In this view, the pension thus promised would appear to be as much a part of his 'wages' as the money paid him at the time of the rendition of his services. But again we say that in any event such a plan is one of the 'conditions of employment.' " [13]

11. W. W. Cross & Co. v. National Labor Relations Board, 1 Cir., 1949, 174 F.2d 875, 878.

12. See Collective Bargaining on Stock Purchase Plans, Sobernheim and Brown, 55 Colum.L.Rev. 1000 (1955); Comments, 43 Geo.L.J. 309 (1955); 23 Geo. Wash.L.Rev. 609 (1955); Compensating the Corporate Executive, Washington and Rothschild, Chs. 6 and 7 (Rev.Ed. 1951).

13. Inland Steel Co. v. National Labor Relations Board, 7 Cir., 1948, 170 F.2d 247, 253, 12 A.L.R.2d 240, certiorari denied on this issue, 1949, 336 U.S. 960, 69 S. Ct. 887, 93 L.Ed. 1112; and see National Labor Relations Board v. J. H. Allison Co., 6 Cir., 1948, 165 F.2d 766, 3 A.L.R.2d 990, certiorari denied, 1948, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369; Cf. National Labor Relations Board v. Black-Clawson Co., 6 Cir., 1954, 210 F. 2d 523.

Richfield's petition for review will be denied and the Board's order for enforcement will be granted as prayed for in its answer to the petition.

Let an order enter accordingly.

WILBUR K. MILLER, Circuit Judge (dissenting).

I dissent because, in my opinion, the stock purchase plan is not a subject concerning which the Act requires collective bargaining. Cf. Board Member Beeson's dissenting opinion in this case, 110 N.L.R.B. at 366 (1954).